**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

DAN DOOLEY, as Liquidating Trustee of the Liquidating Trust of BurgerFi International, Inc.,

Plaintiff,

v.

OPHIR STERNBERG; ALLISON GREENFIELD; MICHAEL RABINOVITCH; FAQUIRY DIAZ CALA; THE IVY COMPANIES, INC.; CASSEL SALPETER & CO., LLC; BTIG, LLC; and 200 W. CYPRESS CREEK HOLDINGS, LLC

Defendants.

Civil Action No.: _________

JURY TRIAL DEMANDED

# COMPLAINT

Plaintiff Dan Dooley, in his capacity as Liquidating Trustee of the Liquidating Trust of BurgerFi International, Inc. (the "Liquidating Trust"), by and through undersigned counsel, brings this Complaint against Defendants Ophir Sternberg; Allison Greenfield; Faquiry Diaz Cala; Michael Rabinovitch; The Ivy Companies, Inc.; Cassel Salpeter & Co., LLC; BTIG, LLC; and 200 W. Cypress Creek Holdings, LLC (collectively, "Defendants"), and alleges as follows:

# TABLE OF CONTENTS


NATURE OF THE ACTION ........................................ 1

PARTIES ........................................ 3

RELATED NON-PARTIES ........................................ 5

PROCEDURAL BACKGROUND: THE BANKRUPTCY CASE AND THE LIQUIDATING TRUST ........................................ 6

JURISDICTION AND VENUE ........................................ 7

FACTUAL BACKGROUND ........................................ 9

I. HISTORY OF BURGERFI AND RELEVANT EVENTS LEADING UP TO THE ANTHONY'S ACQUISITION ........................................ 9

A. BurgerFi's Founding ........................................ 9

B. The de-SPAC Transaction: Sternberg Takes Control ........................................ 9

i. BurgerFi's de-SPAC ........................................ 9

ii. Sternberg Exploits the SPAC Playbook in Tandem Ventures ........................................ 12

C. Sternberg's BurgerFi Compensation Structures Created Perverse Incentives ........................................ 12

D. Sternberg's Delegation of Sweeping Authority to his Close Associate, Diaz Cala ........................................ 13

II. THE ANTHONY'S ACQUISITION ........................................ 16

A. The Insider Defendants Corrupted the Board's Acquisition Deliberations to Advance Their Own Interests ........................................ 16

B. The Insider Defendants Drove and Controlled Every Aspect of the Anthony's Acquisition ........................................ 19

C. The Defendants Embraced Unrealistic Projections and Disregarded Due Diligence Warnings ........................................ 20

D. Defendants Selected and Concealed the Basis for the Projections Provided to the Board. 23

E. Sternberg Personally Inflated BurgerFi's Revenue Assumptions ........................................ 24

F. Insider Defendants Withheld Critical Nonpublic Information Regarding Anthony's Significant 2019 Losses and Defaults ........................................ 25

G. Insider Defendants Suppress Dissent ........................................ 26

H. Insider Compensation Drove the Acquisition ........................................ 30

i. The Compensation that Motivated the Acquisition ........................................ 30

ii. The Insider Defendants Scrambled to Preserve Their Compensation After Being Forced to Abandon the Shareholder Vote ..... 31

iii. The Insider Defendants Secured Themselves Significant Compensation in Connection with the Restructured Deal ..... 32

iv. The Insider Defendants' Immediate Pursuit of Another Acquisition Confirmed Their Strategy of Using Growth to Enrich Themselves ..... 38

I. Defendants Structured the Advisory Process to Suppress Contrary Information, and Advisor Defendants Rubberstamped their Materially Misleading Projections ..... 38

i. The Insider Defendants retain the Advisors ..... 39

ii. Cassel Salpeter omits material information and repackages misinformation at the Insider Defendants' direction ..... 39

iii. BTIG omits material information and repackages misinformation at the Insider Defendants' direction ..... 42

J. Insider Defendants swiftly seek Board approval through a compressed process ..... 43

III. THE ANTHONY'S ACQUISITION IS SUBJECT TO ENTIRE FAIRNESS REVIEW ..... 47

IV. ANTHONY'S AFTERMATH: COLLAPSE AND INSOLVENCY ..... 50

A. Burger Fi Collapses ..... 50

B. Subsequent Performance Vindicated Lion Point's Warnings and Proved the Projections the Board were fed were Baseless ..... 50

C. The Insider Defendants caused insolvent BurgerFi to enter into an onerous lease that benefits Sternberg ..... 53

CLAIMS FOR RELIEF ..... 54

COUNT I: BREACH OF FIDUCIARY DUTIES — DUTY OF CARE AND DUTY OF LOYALTY AGAINST RABINOVITCH ..... 54

COUNT II: BREACH OF FIDUCIARY DUTY — DUTY OF LOYALTY AGAINST STERNBERG AND GREENFIELD ..... 58

A. Sternberg ..... 58

B. Greenfield ..... 59

C. Breaches of the Duty of Care as Predicate Acts ..... 60

COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST DIAZ CALA, THE IVY COMPANIES, CASSEL SALPETER, AND BTIG ..... 60

A. Diaz Cala and The Ivy Companies ..... 61

B. Cassel Salpeter ..... 62

C. BTIG ..... 62

COUNT IV: PROFESSIONAL NEGLIGENCE / NEGLIGENT MISREPRESENTATION AGAINST CASSEL SALPETER ..... 63

COUNT V: PROFESSIONAL NEGLIGENCE AGAINST BTIG, LLC ..... 66

COUNT VI: DISGORGEMENT (EQUITABLE ALTERNATIVE REMEDY) AGAINST STERNBERG, GREENFIELD, AND RABINOVITCH ..... 67

COUNT VII: CONSTRUCTIVE FRAUDULENT TRANSFER UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT (Against BTIG, Rabinovitch, and The Ivy Companies) ..... 69

A. BTIG – Constructively Fraudulent Transfer of Success Fee ..... 71

B. Rabinovitch – Constructively Fraudulent Transfer of Deal-Contingent Bonus ..... 72

C. The Ivy Companies – Constructively Fraudulent Transfer of Deal-Contingent Bonuses ..... 75

COUNT VIII: CONSTRUCTIVE FRAUDULENT TRANSFER UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT AGAINST 200 W. CYPRESS CREEK HOLDINGS ..... 77

PRAYER FOR RELIEF ..... 79

DEMAND FOR JURY TRIAL ..... 81

## NATURE OF THE ACTION

1. This action arises from a scheme by a group of corporate insiders to enrich themselves at the expense of the public shareholders and creditors of BurgerFi International, Inc. ("BurgerFi"), a fast-casual restaurant company.

2. At the center of this case is BurgerFi's November 2021 acquisition of Anthony's Coal Fired Pizza & Wings (the "Anthony's Acquisition"), a transaction through which BurgerFi paid approximately $161 million, in large part financed through debt assumption, to acquire a struggling restaurant chain. The Anthony's Acquisition immediately rendered BurgerFi insolvent and set in motion the financial collapse that culminated in BurgerFi's September 2024 bankruptcy filing. The transaction was, as one of BurgerFi's largest shareholders later put it, "likely one of the dumbest acquisitions I have ever seen a company propose."

3. The Insider Defendants (Ophir Sternberg, BurgerFi's Executive Chairman and the founder of Lionheart Capital, LLC; Allison Greenfield, a Lionheart Capital executive who simultaneously served on BurgerFi's Board; Michael Rabinovitch, BurgerFi's Chief Financial Officer; and Faquiry Diaz Cala, a Lionheart Capital operative who functioned as Sternberg's agent inside BurgerFi through his consulting entity, The Ivy Companies, Inc.) conceived, drove, and consummated the Anthony's Acquisition to serve their own financial interests at BurgerFi's expense. Their incentive compensation was tied to revenue growth, not profitability or sustainability, and the Anthony's Acquisition was the vehicle through which they triggered millions of dollars in equity vesting, cash bonuses, and other benefits for themselves, regardless of whether the transaction had any prospect of creating value for the Company or its stakeholders. That the transaction ultimately led to the Company's demise, and that defendants did not ultimately profit as a result, does not diminish the conflicts of interest that infected every stage of the deal

and the economic damages that were subsequently inflicted upon creditors and shareholders. What matters is that the Insider Defendants believed at the time they drove the wrongful transaction that they would profit.

4. To secure approval of this transaction, the Insider Defendants corrupted every stage of the deliberative process. And when BurgerFi's largest outside shareholder, Lion Point Capital, urged the Board to reject the deal, warning that the debt "could function like a noose around the neck of BurgerFi," the Insider Defendants treated the opposition, not as a governance concern to investigate, but as an attack to defeat.

5. Following Lion Point's objection, rather than risk that the shareholders would reject the transaction, the Insider Defendants restructured the deal to eliminate the shareholder vote entirely, calculating, with the assistance of BurgerFi's attorneys, how to avoid that vote while simultaneously preserving their compensation. They then rushed the Board through approval of the restructured transaction on a compressed timeline—notwithstanding the magnitude of the deal.

6. The Advisor Defendants, Cassel Salpeter & Co., LLC, the investment banking firm that rendered the fairness opinion, and BTIG, LLC, the Board's financial advisor, lent the imprimatur of professional independence to a process that was anything but independent. Both firms were handpicked and directed by the Insider Defendants, not by a disinterested committee. Both accepted and promoted the Insider Defendants' inflated projections without disclosing known defects.

7. The consequences were catastrophic and swift. The Anthony's Acquisition closed on November 3, 2021 and rendered BurgerFi insolvent, transforming the Company from a net cash position of approximately $28 million positive into a net debt position exceeding $84 million negative.

8. Even after the Anthony's Acquisition rendered BurgerFi insolvent, and the Company's net losses exceeded $100 million, the Insider Defendants continued extracting value by awarding themselves stock grants and bonuses. In 2022, they also caused the Company to lease office space from a Sternberg-controlled entity on onerous and above-market terms.

9. This action seeks recovery for the benefit of BurgerFi and its stakeholders through claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, professional negligence, disgorgement of insider compensation, and avoidance and recovery of constructively fraudulent transfers.

## **PARTIES**

10. Plaintiff Dan Dooley is the duly appointed Liquidating Trustee of the BurgerFi International, Inc. Liquidating Trust, established pursuant to BurgerFi's confirmed Chapter 11 plan of liquidation. Mr. Dooley is a citizen of the State of Illinois.

11. Defendant Ophir Sternberg ("Sternberg") is a citizen of the State of Florida. At all relevant times, Sternberg served as both Executive Chairman of the Board of Directors of BurgerFi International, Inc. ("BurgerFi," "Company," or "Debtor") and the Chief Executive Officer of Lionheart Capital, LLC, a company he founded.

12. Defendant Allison Greenfield ("Greenfield") is a citizen of the State of Florida. At all relevant times, Greenfield served as a founding partner, and the Chief Development Officer, of Lionheart Capital and as well as a member of BurgerFi's Board of Directors, and as Chair of its Nominating and Compensation Committees.

13. Defendant Michael Rabinovitch ("Rabinovitch") is a citizen of the State of Florida. Rabinovitch served as Chief Financial Officer of BurgerFi from approximately April 2021 through

July 2023. On July 10, 2023, Rabinovitch departed BurgerFi to join Sternberg, Diaz Cala, and Greenfield at Lionheart Capital as a Senior Advisor.

14. Defendant Faquiry Diaz Cala ("Diaz Cala") is a citizen of the State of Florida. At all relevant times, Diaz Cala served as both the Chief Operating Officer of Lionheart Capital and as a mergers and acquisitions "consultant" to BurgerFi through his consulting entity, The Ivy Companies, Inc.

15. Defendant The Ivy Companies, Inc. ("Ivy Companies") is a Florida corporation with its principal place of business in Florida. The Ivy Companies is the consulting entity owned and controlled by Diaz Cala. The Ivy Companies served as the vehicle through which Diaz Cala received consulting fees from BurgerFi and through which Diaz Cala performed services.

16. Defendant Cassel Salpeter & Co., LLC ("Cassel Salpeter") is a Florida limited liability company with its principal place of business in Miami, Florida. Cassel Salpeter is an investment banking firm that, working under the direction of the Insider Defendants, provided the fairness opinion upon which BurgerFi's Board relied in approving the Anthony's Acquisition.

17. Defendant BTIG, LLC ("BTIG") is a financial services firm. BTIG is a limited liability company organized under the laws of the State of Delaware with its principal place of business in California. BTIG served as financial advisor to BurgerFi's Board of Directors in connection with the Anthony's Acquisition as directed by the Insider Defendants.

18. Defendant 200 W. Cypress Creek Holdings, LLC ("Cypress Creek Holdings") is a real estate holding company incorporated in December 2021. Cypress Creek Holdings, which is a Florida limited liability company managed and controlled by Ophir Sternberg and another Sternberg-owned entity Lionheart Investments, LLC, was the lessor of the Cypress Creek property, which was leased by BurgerFi for its corporate headquarters.

19. Defendants Sternberg, Greenfield, and Rabinovitch are collectively referred to herein as the "Fiduciary Defendants."

20. The Fiduciary Defendants together with Diaz Cala are collectively referred to herein as the "Insider Defendants."

21. Defendants Cassel Salpeter and BTIG are collectively referred to herein as the "Advisor Defendants."

## RELATED NON-PARTIES

22. Anthony's Coal Fired Pizza & Wings ("Anthony's" or occasionally, "ACFP") is a restaurant chain that BurgerFi acquired from L Catterton in November 2021.

23. L Catterton is a private equity firm that acquired Anthony's in 2018 and sold Anthony's to BurgerFi in 2021.

24. OPES Acquisition Corp. ("OPES") was a special purpose acquisition company ("SPAC") sponsored by Lionheart Equities. Sternberg served as Chairman and Chief Executive Officer of OPES. OPES was the vehicle through which the December 2020 de-SPAC transaction was consummated, resulting in BurgerFi becoming a publicly traded company.

25. Lionheart Capital, LLC ("Lionheart Capital") was founded by Sternberg and Greenfield, controlled by Sternberg, and served as the vehicle through which Sternberg exercised control over BurgerFi and extracted economic benefits from the Company through its ownership of the Cypress Creek property that Burger Fi leased.

26. Marcum LLP ("Marcum") was an accounting and advisory firm that BurgerFi engaged to perform limited due diligence on Anthony's in connection with the acquisition process.

27. Lion Point Capital, LP ("Lion Point") (no relationship to the Lionheart entities) is an institutional investor that, at the time of the Anthony's Acquisition, held approximately 15.3%

of BurgerFi's outstanding shares of common stock and approximately 13.8% of all outstanding warrants.

28. Vivian Lopez-Blanco ("Lopez-Blanco") is a former member of BurgerFi's Board of Directors, recruited by Sternberg and Diaz Cala. Lopez-Blanco served as Chair of the Audit Committee and was a member of the Nominating and Compensation Committees.

29. Martha Stewart ("Stewart") is a former member of BurgerFi's Board of Directors, recruited by Diaz Cala. Stewart served on the Audit and Nominating Committees.

30. Gregory Mann ("Mann") is a former member of BurgerFi's Board of Directors. Mann served on the Audit and Compensation Committees.

## PROCEDURAL BACKGROUND: THE BANKRUPTCY CASE AND THE LIQUIDATING TRUST

31. On September 11, 2024 (the "Petition Date"), BurgerFi and its affiliated debtors (collectively, the "Debtors") [1] filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing jointly administered cases styled *In re BurgerFi International, Inc., et al.*, Case No. 24-12017 (CTG) (the "Bankruptcy Case").

32. On March 12, 2025, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (the "Confirmation Order"), confirming the Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (the "Plan").

33. The Plan established the BurgerFi International, Inc. Liquidating Trust (the "Liquidating Trust") and appointed Daniel F. Dooley as the Liquidating Trustee (the "Trustee"). Pursuant to the Confirmation Order, from and after the Effective Date, the Trustee is the exclusive

1

[1] A list of all Debtors in these cases is available at https://cases.stretto.com/BFI.

representative of each Debtor and of each estate with all rights and powers of a trustee under the Bankruptcy Code.

34. As defined in the Plan, "Retained Causes of Action" means all causes of action of the Debtors or the Estates existing as of the Effective Date, whether direct or derivative, whether known or unknown, that are not expressly released under the Plan or Confirmation Order. Without limitation, the Retained Causes of Action include all avoidance actions and all claims and potential claims against former directors, officers, shareholders, or other insiders of the Debtors for breaches of fiduciary duty, negligence, or self-dealing.

35. Pursuant to Section 8.4 of the Plan, all Retained Causes of Action are expressly reserved, preserved, and vested in the Liquidating Trust, by and through the Trustee. The Liquidating Trust has the sole and exclusive discretion and standing to commence, prosecute, pursue, abandon, compromise, release, withdraw, litigate to judgment, enforce, or settle any Retained Causes of Action, either on behalf or in the name of the Liquidating Trust or the Debtors, without further order of the Bankruptcy Court.

36. The claims asserted in this action are Retained Causes of Action within the meaning of the Plan. They are timely filed within two years of the Petition Date. 11 U.S.C. § 108(a); 11 U.S.C. § 546.

**JURISDICTION AND VENUE**

37. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 because this action arises in, and relates to, a case under Title 11 of the United States Code, specifically the Chapter 11 bankruptcy case of BurgerFi International, Inc., Case No. 24-12017-CTG (Bankr. D. Del.).

38. Alternatively, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Plaintiff is a citizen of the State of Illinois. Upon information and belief, no Defendant is a citizen of Illinois; the individual Defendants are citizens of Florida, and the Ivy Companies is incorporated under the laws of Florida, with its principal place of business in Florida. Cassel Salpeter and Cypress Creek Holdings are Florida LLC entities and BTIG is a California LLC entity.

39. Venue is proper in this district pursuant to 28 U.S.C. §§ 1409(c) and 1391(b)(2). The claims asserted in this action are prepetition claims formerly belonging to the Debtor that became property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541 and were retained and transferred to the Liquidating Trust under the Debtor's confirmed plan pursuant to 11 U.S.C. § 1123(b)(3)(B). A substantial part of the events and omissions giving rise to the claims occurred in this district. Accordingly, the Debtor could have commenced this action in this district under applicable non-bankruptcy venue provisions had the bankruptcy case not been commenced.

40. This Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Bankruptcy Procedure 7004(d) and (f). Jurisdiction over each Defendant is consistent with the Constitution and the laws of the United States. This action is a proceeding related to the Debtor's bankruptcy case, and Rule 7004(d), per 28 U.S.C. § 1334(b), authorizes nationwide service of process in such proceedings. Each Defendant resides in, is domiciled in, or otherwise has substantial contacts with the United States, and the exercise of personal jurisdiction is independently proper because each Defendant purposefully directed material conduct and/or undertook material conduct within the State of Florida, and each Defendant therefore could reasonably anticipate being required to defend claims arising from that conduct in Florida.

# FACTUAL BACKGROUND

## I. HISTORY OF BURGERFI AND RELEVANT EVENTS LEADING UP TO THE ANTHONY'S ACQUISITION

### A. BurgerFi's Founding

41. John Rosatti founded BurgerFi in 2011 as a Florida-based fast casual restaurant with franchised locations across several states. BurgerFi was defined by its invented term 'BurgerFication,' which encapsulated its commitment to high-quality ingredients, sustainability, and environmental responsibility.

42. From 2013 to 2015, BurgerFi underwent rapid growth, expanding by 25 to 30 locations per year and becoming one of the fastest-growing brands in the so-called "Better Burger" segment. In 2018, BurgerFi returned to growth mode, with 40% of the Company's system-wide sales attributable to takeout. By June 2020, BurgerFi had expanded to 100 locations, including delivery-only "ghost kitchens."

### B. The de-SPAC Transaction: Sternberg Takes Control

#### i. BurgerFi's de-SPAC

43. On December 16, 2020, BurgerFi went public through a de-SPAC transaction with OPES, a special purpose acquisition company sponsored by entities affiliated with Sternberg. Sternberg served as Chairman and Chief Executive Officer of OPES.

44. A "de-SPAC" transaction follows a basic playbook: the "SPAC", a blank check company with no commercial operations, goes public through an initial public offering ("IPO") to raise money to acquire a target company, which it must typically identify within 18-24 months post-IPO, or seek an extension from shareholders. Because only the SPAC company undergoes the IPO, the disclosure burdens surrounding the private target are significantly reduced.

45. The SPAC holds the investors' funds—which it has typically raised at $10 per shares—in "trust" while it seeks the investment target. Once the SPAC identifies the privately held

target (here, BurgerFi), they combine in a reverse merger or "de-SPAC" transaction, resulting in an operating company with publicly traded shares. Shareholders have the option, in connection with the merger, to redeem their shares or to invest their shares in the newly merged company.

46. SPACS have been heavily criticized by courts for their inherently conflicted nature, as the SPAC's sponsors grant themselves significant founder's shares (usually 20% of the company post-merger) for mere pennies on the dollar, that create huge windfalls to founders regardless of whether the SPAC ultimately creates value for shareholders. In other words, the people running the SPACs are heavily incentivized to close *any* deal to recognize their own gains within the completion window.

47. BurgerFi's de-SPAC exemplified this process, with Sternberg's companies and associates acting as the SPAC sponsors. Following the BurgerFi de-SPAC, Sternberg installed himself as Executive Chairman of BurgerFi's Board of Directors and placed his associates in key positions of control within the Company.

48. Although certain legacy directors were promised board seats and possessed institutional knowledge valuable to the Company's long-term health, Sternberg, who had other objectives, swiftly eliminated them from the board to advance his own objectives.

49. As was consistent with SPAC transactions, the BurgerFi de-SPAC itself was designed to benefit Sternberg and his affiliates at the expense of public shareholders. Sternberg's individual founder shares in OPES were acquired at nominal cost and converted into approximately 15.3% of the combined company's equity without requiring any proportional investment. At this time, Sternberg's 15.3% of BurgerFi's outstanding shares represented the largest single block of stock in the Company.

50. Sternberg's associates and entities also gained significant positions in the post de-SPAC Company. Lionheart Equities, LLC owned 5.4% (1,000,000 shares), LH Equities, LLC owned 7.6% (1,319,341 shares), and all directors and officers owned 18.9% (3.5 million shares), including Greenfield who held 14,616 shares. Lionheart Equities is the majority holder of interest in LH Equities, and Sternberg as manager of Lionheart Equities, had sole voting control of all of LH Equities' and Lionheart Equities' shares.

51. Through Sternberg's direct and indirect stock position, combined with a voting agreement (the "Director Voting Agreement") that bound the Company's stockholders to vote for three years for the slate of directors Sternberg had essentially handpicked, Sternberg exercised effective control over BurgerFi's governance shortly after the de-SPAC. He used that control to craft revenue-based compensation incentives for himself and associates, which would favor sheer growth over long term earnings and cash flow, and thus favor insiders over public stockholders.

52. The Director Voting Agreement also provided that, if a stockholder were unable to participate in a vote for the BurgerFi board, Sternberg would act on behalf of the stockholder to vote in favor of the slate of directors.

53. Following the de-SPAC, BurgerFi operated approximately 110 company-owned and franchised locations. The Company generated revenues of approximately $55.5 million in fiscal year 2020.

54. BurgerFi's stock traded on the NASDAQ exchange under the ticker symbol "BFI." Post de-SPAC, the stock initially traded in the range of $10-$14 per share, before declining precipitously after the Anthony's Acquisition.

55. The de-SPAC transaction brought approximately $78 million in cash to the Company, borne in large part by unwitting retail investors.

### ii. Sternberg Exploits the SPAC Playbook in Tandem Ventures

56. Sternberg used the BurgerFi de-SPAC as a model for a series of additional SPAC ventures, each designed to generate personal wealth through the same control mechanisms and compensation structures deployed at BurgerFi.

57. While serving as Executive Chairman of BurgerFi, Sternberg simultaneously sponsored and managed multiple other SPACs.

58. Sternberg's most notable subsequent SPAC venture was Lionheart II's merger with MSP Recovery, a healthcare claims recovery company doing business under the name "LifeWallet." The MSP Recovery de-SPAC was completed in approximately May 2022 and was subsequently the subject of significant regulatory and investor scrutiny.

59. The MSP Recovery transaction followed the same pattern as BurgerFi: Sternberg exercised control through a SPAC structure, installed allies on its board, and pursued aggressive growth strategies funded by public market capital while extracting personal compensation.

60. The transaction purported to value MSP Recovery at approximately $32.6 billion, yet within the first hour of going public following its de-SPAC, MSP Recovery's stock price immediately plunged by 60% and eventually declined by more than 99%, w billions of dollars of that purported value  and resulting in significant litigation against Sternberg and his associates.

### C. Sternberg's BurgerFi Compensation Structures Created Perverse Incentives

61. Sternberg received no base salary from BurgerFi. Instead, his compensation consisted entirely of equity grants designed to reward aggressive deal-making and rapid revenue growth rather than profits or sustainable value creation.

62. Specifically, Sternberg was awarded (1) 700,000 Benchmark Restricted Stock Units ("Benchmark RSUs") that would vest only if BurgerFi achieved specified revenue targets

set at 10% to 50% above BurgerFi's 2020 base year revenue of $34,382,000; and (2) 250,000 time-vesting RSUs.

63. The structure of Sternberg's compensation created a direct conflict of interest with respect to the Anthony's Acquisition: an acquisition of sufficient size would trigger the vesting of Sternberg's Benchmark RSUs regardless of whether the acquisition created value for shareholders. This gave Sternberg a personal financial interest in consummating the deal at any price—just like the de-SPACs he pursued with BurgerFi and other companies.

64. As discussed in detail below, Sternberg's associates similarly structured their own compensation to incentive artificial revenue growth over shareholder value.

### D. Sternberg's Delegation of Sweeping Authority to his Close Associate, Diaz Cala

65. From the outset of BurgerFi's existence as a public company, Sternberg bestowed substantial authority to Diaz Cala, Lionheart Capital's Chief Operating Officer. Specifically, Sternberg caused BurgerFi to enter into an independent contract agreement for "mergers and acquisitions" services and advice, not with Diaz Cala, but with the Ivy Companies, a company wholly owned by Diaz Cala. Through this mechanism, Diaz Cala reported to Sternberg alone.

66. Notwithstanding the fact that his arrangement made him an independent contractor rather than a fiduciary to BurgerFi, through Sternberg's delegation, Diaz Cala controlled the flow and accuracy of financial information between BurgerFi's management and BurgerFi's Board of Directors, both of which he had a hand in recruiting.

67. On February 16, 2021, Scott Salpeter (the author of the Anthony's Acquisition fairness opinion for BurgerFi, described *infra*), introduced Diaz Cala to Rabinovitch as a candidate for Chief Financial Officer.

68. Diaz Cala interviewed Rabinovitch on February 18, 2021, and on February 26, 2021, BurgerFi executed an Employment Agreement with Rabinovitch for the Chief Financial Officer position (effective April 1, 2021).

69. Like Sternberg's, Rabinovitch's compensation was structured so that an acquisition, such as the Anthony's Acquisition, would directly advance his personal financial interests. Upon execution of his Employment Agreement, Rabinovitch was granted 130,000 RSUs under BurgerFi's 2020 Omnibus Equity Incentive Plan. Vesting of the 130,000 RSUs was subject to, in substantial part, achievement of at least seventy percent (70%) of the Company's adjusted Earnings before Interest, Taxes, and Amortization ("EBITDA") target for the prior fiscal year. The EBITDA definition applicable to Rabinovitch's agreement excluded, among other things, "costs or losses attributable to the issuance of debt, equity or acquisitions or dispositions of stock or assets," "pre-opening costs," and "negative impacts related to the finalization of purchase price allocation of acquired entities." These exclusions ensured that post-acquisition revenue would increase the Company's adjusted EBITDA numerator without any corresponding reduction for acquisition-related costs.

70. Rabinovitch's compensation structure was uniquely favorable compared to peer BurgerFi executives. Vesting of other executives' stock was subject to new store openings and improvement in store operating costs, both of which achieved 0% in FY2021. Rabinovitch's EBITDA-contingent units, with no store-operations metrics, ensured maximum sensitivity to acquisition-driven revenue growth while insulating him from any operational failures.

71. Diaz Cala even dictated the terms of his own engagement with BurgerFi. On March 5, 2021, Diaz Cala directed BurgerFi's outside counsel to prepare Board consent resolutions appointing him as "Chief of M&A & Corporate Strategy" reporting to the Executive Chairman,

explicitly specifying that he would not be a corporate officer. Diaz Cala assured counsel that "Ophir [Sternberg] will approve" and requested that the appointment be made retroactively effective to December 17, 2020 (one day after the de-SPAC closing). Diaz Cala also unilaterally specified his own compensation: 10,000 Benchmark RSUs per year for five years (similar to Sternberg's own annual grants), plus a $100,000 annual consulting fee and medical benefits.

72. Diaz Cala, working with Sternberg and other Lionheart personnel, also recruited Vivian Lopez-Blanco to serve on the Board.

73. By July 2021, when the Anthony's Acquisition was in active negotiations, BurgerFi's Board was composed predominantly of individuals with ties to Sternberg and Lionheart Capital or who had been recruited by Diaz Cala. This composition ensured that the Board would support management's strategic initiatives without meaningful independent scrutiny. The five-member Board was comprised of:

1) Ophir Sternberg, Lionheart Capital Founder and CEO. BurgerFi Executive Chairman of the Board.

2) Allison Greenfield, Lionheart Capital founding partner and Chief Development Officer. BurgerFi Board Member; Compensation Committee Chair; Nominating Committee Chair; and Audit Committee member.

3) Vivian Lopez Blanco, selected by Sternberg and Diaz Cala. Burger Fi Board Member; Audit Committee Chair; Member of Nominating and Compensation Committees.

4) Martha Stewart, selected by Sternberg and Diaz Cala. Burger Fi Board Member; Member of Audit and Nominating Committees.

5) Gregory Mann, Burger Fi Board Member; Member of Audit and Compensation Committees.

74. Diaz Cala's dual role as Chief Operating Officer of Lionheart Capital and the leader of the process through which BurgerFi acquired companies (and satisfied his and Sternberg's revenue-based compensation benchmarks) created a structural conflict of interest.

## II. THE ANTHONY'S ACQUISITION

75. On September 26 and October 8, 2021, the Insider Defendants obtained Board approval for BurgerFi to acquire Anthony's for a total of approximately $161 million in consideration, comprised of $33 million in common stock, $53 million in new junior non-convertible preferred equity, and the assumption of $75 million in existing debt.

76. The Board's approval process unfolded at four closely-spaced decision points:

1) A September 24, 2021 Board Meeting at which BurgerFi's lawyers, Holland & Knight, first walked the Board through the full suite of transaction documents;

2) A September 26, 2021 Audit Committee meeting at which Rabinovitch acknowledged that BurgerFi's ability to satisfy the Regions Bank Credit Agreement's financial covenants had not yet been analyzed;

3) A September 27, 2021 Board Meeting at which the Board received Cassel Salpeter's oral fairness opinion, heard BTIG's updated presentation, and voted to approve the acquisition prior to stockholder approval; and

4) An October 8, 2021 Board Meeting at which the deal was restructured, and the Board was told that stockholder approval would no longer be required. The Board approved the new structure at the same meeting.

### A. The Insider Defendants Corrupted the Board's Acquisition Deliberations to Advance Their Own Interests

77. As described above, Sternberg, Diaz Cala, and Rabinovitch each had a material personal interest in closing the Anthony's Acquisition. Greenfield had a material personal interest in advancing Sternberg's personal interest. Sternberg, Diaz Cala, Rabinovitch, and Greenfield, with assistance from Cassel Salpeter, and BTIG, manipulated the Board's deliberative process and procured the Board's approval of the Anthony's Acquisition by withholding and misrepresenting material information about the deal.

78. Specifically, the Insider Defendants wrongfully interfered with the Board's deliberative process through eight material misrepresentations and omissions (collectively, the "Material Misrepresentations"):

1) Sternberg and Diaz Cala directed, and Rabinovitch implemented and presented, inflated projections for Anthony's to the Board, to Cassel Salpeter, and to lenders. Both the projections presented to the Board and the projections presented to lenders materially overstated Anthony's projected revenue, and Anthony's actual post-acquisition performance fell far short of both projections. The Board was not told that a second, lower set of projections existed.

2) Sternberg, Diaz Cala, Rabinovitch, Cassel Salpeter, and BTIG used revenue projections for Anthony's in presentations to the Board that were materially higher than those provided to lenders, and did not advise the Board they were doing this. As illustrated in the chart below, the gap between the estimated revenue in the models grew over time: by 2024, the Board was shown Anthony's revenue projections that were $13.7 million higher than the projections in the more conservative lender model.

| Year | Projected Anthony's Revenue in Board Presentations | Projected Anthony's Revenue in Lender Model | **Difference (Board vs. Lender)** |
|---|---|---|---|
| 2021 | $123.5M | $120.2M | **$3.3M** |
| 2022 | $143.0M | $136.5M | **$6.5M** |
| 2023 | $152.9M | $142.8M | **$10.1M** |
| 2024 | $164.2M | $150.5M | **$13.7M** |

3) Sternberg, Diaz Cala, Rabinovitch, Cassel Salpeter, and BTIG also used higher EBITDA projections for Anthony's in presentations to the Board than those provided to lenders, and did not advise the Board they were doing this. As illustrated in the chart below, over a three-year period, the gap in these projections amounted to $6 million, a figure approximately 25% higher than the one in the lender model.

| Year | Projected Anthony's EBITDA in Board Presentations | Projected Anthony's Revenue in Lender Model | **Difference (Board vs. Lender)** |
|---|---|---|---|
| 2022 | $17.3M | $15.0M | **$2.3M** |
| 2023 | $20.4M | $16.4M | **$4.0M** |
| 2024 | $24.3M | $18.3M | **$6.0M** |

4) Sternberg inflated BurgerFi per-store revenue assumptions without factual support, and Rabinovitch implemented and transmitted the inflated figures. Sternberg directed that

new-store revenue be raised to $2 million per store to "bridge the gap" back to predetermined EBITDA targets, an assumption not based on any financial data. Rabinovitch admitted Sternberg's new-store revenue assumption was not good, and the analyst who built the model at his direction cautioned that the number would be hard to hit. Rabinovitch used the assumption anyway.

5) Sternberg, Diaz Cala, and Rabinovitch failed to advise the Board of Anthony's 2019 losses, a $35 million goodwill impairment accounting loss that was taken, and a September 2019 loan covenant default, all of which occurred months before BurgerFi entered into the Anthony's Acquisition.

6) Rabinovitch directed Cassel Salpeter to exclude the 2025 projections from the fairness analysis, and Diaz Cala concurred in that direction. On August 23, 2021, Rabinovitch confirmed that "the 2025 projections do not represent best available estimates and judgements as to ACFP future financial results and condition" and instructed the Cassel Salpeter not to use or rely on them, depriving the fairness opinion of a longer-term view that would have required evaluation of whether the projected growth trajectory was achievable or sustainable.

7) Diaz Cala selected and dictated a 22x EBITDA multiple used to value the combined Company, and Rabinovitch acquiesced. Diaz Cala similarly directed a $1.5 million "synergy" assumption. Both figures were Diaz Cala's directives, not the product of independent analysis, and neither Sternberg nor Rabinovitch objected.

8) Diaz Cala, with Sternberg's and Rabinovitch's knowledge and participation, failed to disclose to the Board that they had consulted with BurgerFi's lawyers to strategize ways to backfill the management compensation that had to be removed when the deal was restructured to avoid a shareholder vote. Specifically, Diaz Cala concealed from the Board their efforts to replace with common stock the approximately 900,000 RSUs that were eliminated from the Stock Purchase Agreement to stay below NASDAQ's 20% threshold. Sternberg, Diaz Cala, and Rabinovitch simultaneously calculated how to avoid a shareholder vote and preserve management compensation within that constraint, but did not disclose that effort to the Board.

79. Each Material Misrepresentation concerned information that was relevant and of a magnitude to be important to the Board in carrying out their fiduciary duties in decision making.

80. The sections that follow detail the factual basis for each of the Material Misrepresentations and the broader scheme of insider manipulation that facilitated them.

**B. The Insider Defendants Drove and Controlled Every Aspect of the Anthony's Acquisition**

81. In December 2020 and within days after the de-SPAC closed, Sternberg and Diaz Cala initiated contact with L Catterton, the private equity firm that had acquired Anthony's in 2018. At the time of those initial discussions, Anthony's operated approximately 60 locations in the eastern United States, primarily in Florida, and generated trailing twelve-month EBITDA of approximately $4.4 to $4.7 million.

82. Sternberg and Diaz Cala drove the negotiations with L Catterton without involving the other directors. Although the Board was eventually informed of the discussions in general terms, Sternberg and Diaz Cala did not give the Board an opportunity to direct the process or evaluate whether the Anthony's Acquisition was in BurgerFi's best interests before they substantially advanced the negotiations.

83. In March 2021, BurgerFi executed a letter of intent ("LOI") to acquire Anthony's, negotiated primarily by Sternberg and Diaz Cala. The LOI contemplated approximately $181.0 million in Transaction Consideration, comprising $54.0 million in newly issued BFI common stock, $54.0 million in a convertible note, and the assumption of approximately $73.0 million in Anthony's net debt, for a business generating trailing adjusted EBITDA of only approximately $4.3 to $4.7 million. The implied multiple was approximately 38-41x trailing EBITDA, far above the approximately 10.5x median multiple observed in comparable restaurant acquisitions. No independent analysis supported those terms or evaluated Anthony's historical performance, sustainable operations, or BurgerFi's ability to bear the resulting obligations.

84. Following the LOI, Diaz Cala took control of the advisory and due diligence process. He engaged advisors, BTIG and Cassel Salpeter, without formal Board authorization,

selecting firms with which he had pre-existing relationships, and controlled communications between the advisors and the Board.

85. On March 22, 2021, Diaz Cala instructed Cassel Salpeter to "send to the team @ BFI your engagement letter for a fairness opinion regarding [the] AFCP purchase," confirming that the Insider Defendants (not a disinterested committee) selected and retained the provider of the supposedly independent opinion. Cassel Salpeter's president, Scott Salpeter, confirmed under oath that *[Omitted pursuant to disputed confidentiality designation.]*

86. BTIG's managing director, Daniel Shea, likewise confirmed that the engagement terms were "likely communicated to [him] by Faquiry Diaz Cala," and testified that Diaz Cala "did not have a role in management or on the board"; he "worked more for Lionheart than directly operating at BurgerFi."

**C. The Defendants Embraced Unrealistic Projections and Disregarded Due Diligence Warnings**

87. Between the March 2021 LOI and the November 3, 2021 closing, Sternberg, Diaz Cala, and Rabinovitch repeatedly increased Anthony's projected revenue and EBITDA to support transaction terms they had already committed to pursue. Rather than test whether the Acquisition was sustainable or could be integrated without impairing BurgerFi, they worked backward from those terms. Each revision moved farther from Anthony's historical performance and deeper into speculation, increasing the risks of debt burden, wasted fees, insolvency, and creditor harm.

88. In July 2021, BurgerFi engaged Marcum to perform limited due diligence related to the potential acquisition of Anthony's. On August 7 and 9, 2021, Marcum submitted early drafts of its due diligence to Rabinovitch and Diaz Cala.

89. On August 15, 2021, Rabinovitch transmitted an updated Anthony's model to Cassel Salpeter, explaining that it "has FY 2022 at $17.55m of adjusted ebitda," that "[i]t is this

amount that will be used for determining purchase price and also will be used to update the board decks with," and instructing Cassel Salpeter to "check in directly with Faquiry [Diaz Cala] as he may have further changes to the deal structure, price, etc."

90. The same day, Diaz Cala directed the seller's deal team to prepare the specific model that Rabinovitch would transmit to Cassel Salpeter. In an email to Marcum, L Catterton personnel, and Rabinovitch, Diaz Cala wrote: "With [this] range please team LCAT provide a model that we can take to the fairness opinion team. We can live with a $17.5 Ebitda number. Thank you. Please send back so we can send to Cassel Salpeter." Diaz Cala thus determined the EBITDA figure that would anchor the fairness opinion and other board presentation materials, directed the seller to build a model supporting that figure, and arranged for it to be transmitted to the fairness provider.

91. On August 16, 2021, Salpeter observed that the "actual Q2 adjusted EBITDA in this model are substantially different than [the] prior model," having swung from "$727,571" to "$250,371," and asked whether the change reflected "Marcum adjustments." Despite recognizing this precipitous drop in Anthony's "actual" EBITDA, Rabinovitch made no change to Anthony's *projected* 2022 EBITDA, and Salpeter simply accepted that unreasonable assumption.

92. On August 20, 2021, Marcum issued its final due diligence report on Anthony's (the "Marcum Report") to BurgerFi. Marcum's own executive summary presented the $17 million projected EBITDA alongside the $4.4 million actual figure, an obvious disconnect (a 286% increase) that should have been thoroughly investigated, vetted, and tested by the Insider Defendants.

93. The Marcum Report: (a) confirmed trailing twelve-month adjusted EBITDA of approximately $4.4 to $4.7 million; (b) noted that Anthony's adjusted net sales remained 9.4%

below comparable 2019 levels; (c) disclosed key assumptions underlying the projections; and (d) explicitly warned that there were "no assurances" that the projected EBITDA figures would be achieved.

94. Specifically, the Marcum Report highlighted that the projected EBITDA figure provided by Anthony's had problems as it assumed a "normalized post-covid recession/depression free economy", including:

1) Consumption mix between food and beverage similar to 2019
2) Proportion of in-store dining and delivery similar to 2019 with 2.5% incremental delivery revenue
3) No food or labor shortages
4) Same store sales for FY22B returning to FY19 levels
5) Core price increases with an average impact of 2% for all non-Third-Party orders
6) 2.5% incremental volume of Third-Party delivery sales
7) An estimated savings of $1.4M resulting from reduction of corporate payroll
8) Labor savings resulting from reduced payroll burden for increasing sales volumes based upon actual hourly labor savings for stores with recovered sales volume.
9) Commodities price increases resulting in an estimated 1.75% to 3.5% increase in COGS.
10) An estimated 0.5% increase in operating expenses

95. After receiving the Marcum Report and its express warning that there were no assurances the projected EBITDA would be achieved, Rabinovitch did not prepare an independent analysis of the 286% gap between actual and projected EBITDA or author a Board presentation evaluating whether the Acquisition was justified at the proposed price.

96. On August 24, 2021, Director Vivian Lopez-Blanco advised the assumption of "no food or labor shortages" was, "[g]iven the prolonged effects of the pandemic," one she was "not sure" was "a reasonable assumption," and she wrote that the "midpoint" used to derive the projected fiscal year 2022 Anthony's EBITDA of $17.3 million "seems extremely aggressive given the commodity and labor expense assumptions discussed."

97. On August 27, 2021, Lopez-Blanco reiterated that "[b]oth the $17.3 and the $11 million for Anthony's and BFI seem aggressive given where both of them are at in 2021."

98. Even Rabinovitch noted to Diaz Cala on September 20, 2021 that BurgerFi's own financial condition was deteriorating. Rabinovitch wrote that "[i]t's looking pretty grim, EBITDA at $3.5m and cash balances getting lower than they need to be." In the same exchange, he explained: "Regarding ACFP, we have not received any new numbers from them and haven't asked. If we ask, they may ask for ours as well." Rabinovitch and Diaz Cala thus chose not to obtain current Anthony's results, preserving the inflated figures on which the Board would rely.

**D. Defendants Selected and Concealed the Basis for the Projections Provided to the Board**

99. Sternberg, Diaz Cala, and Rabinovitch selected the most aggressive projection case for the Board materials. The projections presented to the Board projected Anthony's 2022 EBITDA of approximately $17.3 million and incorporated unrealistic assumptions about new store openings, same-store sales increases, and margin expansion. A more conservative set of projections had been prepared, but management did not disclose its existence or explain that the figures presented to the Board represented the most optimistic case.

100. On July 25, 2021, Diaz Cala transmitted an updated Anthony's presentation to the deal team, describing it as "the equity case which is far more aggressive than the debt (lender case). This presentation is what will be shared with the BFI board by Ophir [Sternberg]."

101. Sternberg, Rabinovitch, and Diaz Cala did not advise the Board that alternative models had been prepared or that the figures they chose to present to the Board reflected their selection of the more aggressive Anthony's equity case, rather than the more conservative Anthony's lender model, or that two models existed. Without that disclosure, the directors could not compare the cases or recognize that the aggressive case drove the Acquisition economics.

102. In contrast, the existence of parallel, inconsistent models was openly discussed amongst the Insider Defendants. On August 1, 2021, Rabinovitch acknowledged that the team needed "to discuss which model to use, as well as discuss if we can have different projections in the board deck than lender deck." *[Omitted pursuant to disputed confidentiality designation.]*

103. The Insider Defendants controlled which cases would be blended to produce the Board presentation. Specifically, on August 25, 2021, Rabinovitch wrote that "[t]he projections for the board are to use the conservative case BFI numbers used in the lender model and the updated equity case for ACFP which has $17.3m. this is what the fairness is using."

104. *[Omitted pursuant to disputed confidentiality designation.]* By directing which projections Cassel Salpeter could use, the Insider Defendants ensured the advisory output would support the predetermined transaction rather than provide independent evaluation.

**E. Sternberg Personally Inflated BurgerFi's Revenue Assumptions**

105. Sternberg, Rabinovitch and Diaz Cala presented the Board with aggressive projections without disclosing the assumptions underlying them, the extent to which they departed from historical performance, or the conflicts affecting their preparation.

106. Sternberg personally directed key assumptions in the model given to the Board. When BurgerFi's management's mid-year forecast fell short of the numbers needed to support the Anthony's deal, the Insider Defendants increased the BurgerFi per-store revenue assumption at Sternberg's suggestion to bridge the projections back to predetermined EBITDA targets. This was confirmed by Rabinovitch who reported on July 1, 2021 that "[t]he sales per new store were raised per ophir's suggestion to $2m which did bridge the gap for the future years back to the original EBITDA of $15, $25, $35."

107. The BurgerFi employee who actually populated the model at Rabinovitch's direction recognized the revised assumption was not achievable. On June 29, 2021, the analyst

who built the model wrote, "I made all stores starting at $2M," and cautioned "[t]he 2022 number is hard to hit." Rabinovitch himself later admitted that "[t]he $2m per new store isn't a good assumption." The Insider Defendants used it anyway.

### F. Insider Defendants Withheld Critical Nonpublic Information Regarding Anthony's Significant 2019 Losses and Defaults

108. Before the Anthony's Acquisition closed, Anthony's was a private L Catterton portfolio company and did not publish financial statements. Public investors could see only limited indicators, such as unit-count data and trade press regarding the Chicago exit, while Anthony's losses, goodwill impairment, covenant defaults, and lender forbearance remained in private financial records unavailable to public shareholders.

109. Those private financial records, however, were available as part of the acquisition due diligence to Sternberg, Rabinovitch, and Diaz Cala before the Anthony's Acquisition was signed and closed. Indeed, Anthony's audited financial statements, including a May 4, 2021 audit opinion from BDO, Anthony's auditor, reflected Anthony's 2019 losses, a $35.1 million goodwill impairment, and a September 2019 loan covenant default, months before BurgerFi acquired Anthony's.

### G. Insider Defendants Suppress Dissent

110. On August 31, 2021, Lion Point, a sophisticated institutional investor holding approximately 15.3% of the Company's outstanding shares of common stock and approximately 13.8% of all outstanding warrants, sent a letter to BurgerFi's Board expressing strong opposition to the proposed Anthony's Acquisition.

111. Lion Point's letter set forth specific, substantive objections to the transaction: (1) BurgerFi had struggled to grow since the OPES acquisition and lacked the operational capacity to absorb a second brand; (2) the addition of Anthony's would layer organizational and financial

complexity onto an already challenged enterprise; (3) due diligence had been rushed and limited; (4) Anthony's had struggled in recent years under L Catterton's ownership; and (5) the deal structure required BurgerFi to take on a substantial debt burden that would constrain the Company's growth, notably observing "BFI's financial position would immediately transform from a net *cash* position of $28 million at transaction close to a net *debt* position of $84.5 million[.]"

112. BurgerFi's due diligence on the Acquisition consisted solely of a Quality of Earnings report prepared by Marcum LLP. Although the Marcum report exceeded 120 pages, it focused narrowly on financial verification. Lion Point's concerns about this report were pointed and specific. Its letter stated that BurgerFi "appears to have performed inadequate due diligence" and criticized the assumption "that a Quality of Earnings report is all that is necessary."

113. Although Sternberg, Diaz Cala, and Rabinovitch relied on Marcum's narrowly scoped Quality of Earnings report, Lion Point performed its own proprietary research and industry calls regarding Anthony's, which "raised serious concerns about the company's brand, management, and growth opportunities." Lion Point's internal assessment of the transaction was blunt. Internal Lion Point work product evaluating the deal stated: "Little to no due diligence done by Lionheart [Sternberg and Diaz Cala's company]"; "By their own admission, they have not engaged a consulting firm to analyze how strong / weak ACFP"; that the "Rationale given by Faquiry [Diaz Cala] is that he is just buying cash flow, with zero thought to the massive amount of debt being taken on"; and concluded that "This is likely one of the dumbest acquisitions I have ever seen a company propose."

114. Lion Point's notes record Diaz Cala's response when asked, "Who has done the diligence on their side?": "No one. Cares only about Q of E" (i.e., Marcum's report). The response

confirms that the Insider Defendants did not engage an independent strategic consultant and relied solely on Marcum's financial verification, leaving Anthony's operational and competitive risks unassessed.

115. Lion Point's letter warned specifically about the danger of the debt the Company was preparing to assume. Lion Point wrote that the debt "could function like a noose around the neck of BurgerFi" and that "the interest cost of that debt would limit and perhaps even erode the financial flexibility required for the Company's growth plan."

116. Lion Point also challenged the fundamental strategic logic of the acquisition, noting that Anthony's "represents a turnaround of a stale brand" and asking pointedly why BurgerFi shareholders should "believe that the Merger Advocates [Faquiry Diaz Cala and Ophir Sternberg] and BFI management can do better with ACFP than L Catterton has to date?"

117. Lion Point's opposition threatened Sternberg's, Diaz Cala's, and Rabinovitch's compensation plan. If the Board rejected the deal or shareholders defeated it in a vote, the Anthony's Acquisition would not close and the closing-conditioned incentive compensation would not be triggered. Those defendants responded by preserving the transaction and their compensation, as described below.

118. Rather than treat Lion Point's August 31, 2021 letter as the governance alarm that it was, the Insider Defendants treated it as an attack to be defeated. On September 2, 2021, just one day after receiving the letter, Diaz Cala forwarded it to Holland & Knight, BurgerFi's outside counsel, together with a document in which he had prepared handwritten annotations and rebuttals to each of Lion Point's points. In his transmittal, Diaz Cala stated: "We have not sent this to anyone. Were [sic] using it as talking points when we speak to each individual Director." The Insider Defendants' first instinct was not to convene a special committee or engage independent

advisors; it was to prepare a rebuttal document and then deploy it in a one-on-one campaign to neutralize individual directors' concerns before those concerns could coalesce into collective Board skepticism.

119. Where Lion Point, holding 15.3% of outstanding shares, raised substantive concerns, including that it had reviewed limited due diligence materials, performed its own independent analysis, and warned that Anthony's had struggled in recent years with revenue remaining below its 2019 levels, Diaz Cala dismissed the letter as "nothing more than a greenmail tactic by a short-term focused hedge fund seeking to take advantage of this situation and get a payoff," stated that "[t]he BFI team rejects this baseless accusation," and retorted that if Lion Point "would have bothered to review the Marcum QoE" report, it would understand "how innacurate [sic] the above statement is." The Insider Defendants thus framed the objections of a major long-term institutional investor not as a governance concern warranting investigation, but as an extortion attempt to be dismissed.

120. In fact, Lion Point's statement was accurate: BurgerFi's own due diligence provider, Marcum, had confirmed just twelve days earlier that Anthony's adjusted net sales remained 9.4% below comparable 2019 levels and that its trailing twelve-month adjusted EBITDA had collapsed by 67.6% from FY2019. The very report Diaz Cala invoked as refuting Lion Point's concerns corroborated them.

121. While Diaz Cala was dismissing Lion Point's concerns and preparing his rebuttal, he was simultaneously sweetening the transaction for the very directors whose support he needed. On September 1, 2021, the same day Lion Point's letter was sent to the Board, Diaz Cala emailed the Compensation Committee proposing a one-time share bonus for the BurgerFi senior team as a mechanism to "tru them up" tied to the Anthony's closing. In the same email, Diaz Cala proposed

increasing Board director RSUs to 15,000 per year, nearly doubling their equity compensation, framed as "a reflection of the added responsibilities and bigger business" that the Anthony's acquisition would create. The timing was not coincidental. On the very day the Insider Defendants received the most serious challenge to the deal, Diaz Cala moved to ensure that both management and the Board had a personal financial stake in seeing the transaction through.

122. The contemporaneous minutes of the September 3, 2021 Board meeting confirm the sequence of events. Sternberg personally presented the Company's response to Lion Point's letter, and BTIG walked the Board through various scenarios, including one based on Lion Point's assumptions. The meeting adjourned at approximately 1:00 pm EDT. The Board did not form a special committee to evaluate Lion Point's concerns. The Board did not engage independent advisors to assess the adequacy of the Company's due diligence. The Board did not commission a strategic review by an independent consulting firm, as Lion Point had urged. The Board did not slow the process. Instead, the most conflicted insider personally presented the Company's "rebuttal," and BTIG, an advisor selected by the Insider Defendants and paid only upon closing, walked the Board through the Insider Defendants' preferred scenarios. At no point did the Insider Defendants substantively engage with the core of Lion Point's objections: that due diligence was inadequate, that the debt burden was dangerous, that the financial projections were aggressive, and that no independent strategic assessment had been conducted. Each of these concerns would prove prescient. The Insider Defendants instead managed the optics, treated the letter as an adversarial attack, and marched the Board toward approval.

### H. Insider Compensation Drove the Acquisition

#### i. The Compensation that Motivated the Acquisition

123. From the earliest stages of the Anthony's Acquisition, Sternberg, Diaz Cala, and Rabinovitch structured the transaction to generate personal compensation.

124. On August 3, 2021, before the Board had voted on the transaction, Diaz Cala emailed Sternberg and BurgerFi counsel at Holland & Knight: "For your EYES only not be shared with anyone at this time . . . we would like to issues [sic] an additional 900,000 shares in consideration to the BFI senior leadership as part of this transaction. The idea is that our team is compensated much lower all around than the ACFP team therefore we would like to grant a one-time share grant to make them whole for their lower comp vs the ACFP." Diaz Cala would later deploy this "parity" rationale to justify the compensation to the Board, but the secrecy of his August 3 email and his subsequent acknowledgment that the Insider Defendants compensated themselves for closing the deal belied the notion that the awards were a routine governance matter rather than a self-interested scheme.

125. On September 23, 2021, Diaz Cala further detailed the compensation plan to BurgerFi's counsel at Holland & Knight: "Team as we have spoken we would like to issues [sic] 900,000 Restricted Stock Units ('RSU') to the Senior Team @ BFI Upon closing of this transaction. These RSU will have not [sic] vesting / no lock up." He added, "Additionally there maybe [sic] payments of up to $500,000 in cash compensation to the M&A / Finance team right after closing (so as to not trip the Regions cash consents)."

**ii. The Insider Defendants Scrambled to Preserve Their Compensation After Being Forced to Abandon the Shareholder Vote**

126. When, as described above, major shareholder Lion Point opposed the deal, rather than reconsider its merits, the Insider Defendants restructured the transaction to preserve both closing and their compensation, thereby advancing their personal interests over BurgerFi's long-term interests.

127. Originally, the Board approved the Anthony's Acquisition on September 27, with the understanding that there would be a later shareholder vote on the transaction. At some point

thereafter, the Insider Defendants determined that plan was too risky and that a board vote (already obtained) was the safest vehicle for the Acquisition's approval. The problem was that too much insider stock was being granted as part of the deal; to meet NASDAQ requirements, insider stock payments would have to be ratcheted back considerably. Given that these stock grants were what motivated the acquisition in the first place, this was a problem that was apparently keeping Diaz Cala up at night.

128. On September 30, 2021, at 1:52 AM, Diaz Cala wrote to BurgerFi's lawyers: "Help us calculate. How much common [stock] can we issue as part of consideration, compensation, and $9 mm compensation to the BFI management team. Getting to 19 to 19.5%. Without shareholder vote. Can we still issue let's say 900,000 or 800,000 management comp shares?" This single communication is remarkable for what it reveals: the Insider Defendants were simultaneously calculating how to avoid a shareholder vote and how to preserve $9 million in management incentive compensation within that constraint. The two objectives were intertwined in the same email and the same calculus.

129. Holland & Knight confirmed the viability of the path the Insider Defendants sought, advising that if the shares to be issued at closing could be structured to represent less than 20% of the Company's outstanding shares, then a shareholder vote could be avoided. The Insider Defendants thus had a roadmap: keep the common stock issuance below 20%, and no shareholder would have the opportunity to vote against the deal.

130. By October 8, 2021, the deal had been restructured and Holland & Knight informed the Board that "stockholder approval will no longer be required for the closing of the transaction." The original deal structure had expressly contemplated a stockholder meeting to approve the acquisition, the NASDAQ proposal regarding issuance of more than 20% of outstanding shares,

and the amendment to the incentive plan. Each of these protective mechanisms was eliminated through the restructuring.

131. Upon information and belief, the Insider Defendants restructured the deal to avoid a shareholder vote because they knew, following the opposition of a 15.3% shareholder, that submitting the transaction to a vote created a meaningful risk of defeat. Rather than treat that risk as a signal that the transaction lacked broad shareholder support, the Insider Defendants engineered around it, ensuring that no shareholder would have the opportunity to vote the deal down.

**iii. The Insider Defendants Secured Themselves Significant Compensation in Connection with the Restructured Deal**

132. The Insider Defendants' compensation in connection with the Anthony's Acquisition took multiple forms. First, the Insider Defendants received deal-contingent compensation expressly tied to closing, consisting of a $500,000 pool of discretionary cash bonuses allocated entirely to Diaz Cala ($250,000, through the Ivy Companies) and Rabinovitch ($250,000). Second, the Insider Defendants held structural compensation under their employment and consulting agreements, including Benchmark RSUs that vested based on revenue targets the Anthony's Acquisition was designed to mechanically trigger, time-based RSUs, and acceleration clauses guaranteeing full vesting upon termination. Third, Diaz Cala maintained an independent contractor agreement through the Ivy Companies that provided $100,000 in annual cash compensation and expense reimbursements, payable monthly regardless of Company performance. Fourth, the Insider Defendants continued to extract additional compensation in subsequent years, including via the December 2022 "supplemental grants" and the May 2024 separation agreement. These overlapping mechanisms ensured the deal advocates would be paid at every stage irrespective of shareholder value.

133. Pursuant to the $500,000 discretionary bonus pool, Diaz Cala (via the Ivy Companies) received a $250,000 cash bonus in November 2021 expressly in connection with the Anthony's Acquisition. Rabinovitch received an identical $250,000 cash bonus approved by the Compensation Committee on November 1, 2021, two days before closing. The Stock Purchase Agreement authorized the Company to award up to $500,000 in discretionary performance bonuses to management; the Insider Defendants allocated the entirety of this pool to themselves, with no other BurgerFi personnel receiving any portion.

134. When the Audit Committee approved the $250,000 bonus to Diaz Cala's company, the written consent explicitly acknowledged that Diaz Cala "may be considered to have a direct or indirect material interest in the Bonus, possibly rising to the level of 'transactions with related persons' contemplated under Item 404 of Regulation S-K."

135. The Insider Defendants used December 2021 stock grants, issued shortly after closing, to achieve what they could not obtain directly from the deal after reengineering it to avoid a shareholder vote. Sternberg received 303,956 shares, Rabinovitch received 164,613 shares, and Diaz Cala received 37,959 shares. Directors Greenfield, Lopez-Blanco, Mann, and Stewart each received 5,000 shares. All awards were unrestricted, meaning the recipients could sell them immediately, subject only to securities law limitations. As Diaz Cala stated in a December 13, 2021 email to Holland & Knight, the awards were "READY TO BE USED BY EXECUTIVES AS OF 1/3" (January 3, 2022), just two months after closing, with "NO VESTING."

136. The Insider Defendants were able to issue these shares only because BurgerFi's equity incentive plan contained a 5% evergreen provision that automatically increased shares available for issuance on January 1, 2022, and because 80,000 shares that Ross Goldstein (the departing CLO) was forfeiting could be recycled for new awards. Before the deal closed, Holland

& Knight, at Diaz Cala's request, identified these additional share pools as the mechanism through which management compensation could be backfilled after the 900,000 management shares were removed from the Stock Purchase Agreement to stay below the NASDAQ 20% threshold.

137. Upon information and belief, these shares were in addition to the Benchmark (revenue-triggered) RSUs that Sternberg, Diaz Cala, and Rabinovitch received as a result of the Anthony's Acquisition. The addition of 61 Anthony's restaurants to BurgerFi's portfolio mechanically inflated Company revenue to trigger these Benchmark RSUs, regardless of whether the combined enterprise was generating profits, reducing debt, or creating shareholder value. While these grants were not formally conditioned on the Anthony's Acquisition closing, their structure made the deal a virtual guarantee of vesting.

138. The Company's independent directors later recognized the troubling nature of the Insider Defendants' compensation. On December 15, 2021, BurgerFi board member and Lionheart employee Greenfield, acting as Chair of the Compensation Committee, sent independent director Lopez-Blanco research in support of year-end Compensation Committee resolutions. Greenfield emailed Lopez-Blanco and the other member of the Committee, director Mann, proposing specific "in-kind tru-up" stock awards to BurgerFi executives totaling hundreds of thousands of unrestricted shares. Greenfield also proposed reducing the vesting thresholds from $14/$16/$18 per share to $11/$13/$15 per share, which she described as necessary "in light of the additional dilution created by the ACFP deal."

139. Lopez-Blanco responded to Greenfield the following day flagging "What is absent or not mentioned is a fair market comparison for overall executive compensation" and "strongly recommend[ed] this committee hire an independent compensation consultant," noting that "proxy firms such as ISS and Glass Lewis . . . will potentially ask for this." Mann likewise questioned the

proposed "tru up," complained that the materials had arrived without notice, and requested that the Compensation Committee meet first. These objections raised obvious red flags about the process, but no independent compensation consultant was engaged.

140. *[Omitted pursuant to disputed confidentiality designation.]*

141. Despite these objections, on December 21, 2021, the consent was circulated for signature. Diaz Cala, who was not a director, officer, or member of the Compensation Committee, approved the final consent and directed Holland & Knight to circulate it for execution, confirming his functional control over BurgerFi's corporate governance.

142. Diaz Cala maintained a parallel cash extraction channel through the consulting agreement between BurgerFi and the Ivy Companies. Pursuant to that agreement, Diaz Cala provided consulting services in exchange for $100,000 in annual cash compensation and expense reimbursements. The Ivy Companies was an entity through which Diaz Cala, as Chief Operating Officer of Lionheart Capital (Sternberg's company), channeled his services to BurgerFi. These consulting fees continued to flow regardless of BurgerFi's stock price or financial performance, ensuring that the deal advocates received steady cash compensation even as the enterprise deteriorated toward insolvency. The consulting fees were not subject to arm's-length negotiation or independent review and were approved by the insider-controlled Board.

143. The Insider Defendants' compensation did not end with the Anthony's closing. Having done his part to secure the Anthony's Acquisition, in February 2022, less than four months after closing, Rabinovitch personally negotiated with Sternberg to accelerate additional RSU grants that would capitalize on the acquisition-driven EBITDA boost. On February 24, 2022, Rabinovitch met privately with Sternberg over lunch and memorialized the agreed terms in an

email: "We agreed to modify my KPI shares available in 2023 and 2024 to instead be vestable based on achieving 2022 KPIs."

144. That arrangement meant that 75,000 RSUs (35,000 and 40,000 shares originally scheduled to vest in years three and four) would instead vest based on FY2022 KPI achievement, capitalizing on the continued artificial EBITDA boost from the Anthony's Acquisition. Rabinovitch also secured an immediate salary increase from $240,000 to $400,000.

145. On December 31, 2022, the Compensation Committee approved a further round of "supplemental grants" that mechanically converted the Company's declining stock price into larger share awards for the Insider Defendants. The resolution's formula divided each insider's annual vesting amount by the ratio between the $6.00 stock price at which their original awards were calculated and the current price of $1.25 (a mechanism that automatically multiplied the number of shares granted in direct proportion to the decline in shareholder value).

146. Under this formula, Sternberg received 722,000 unrestricted shares and Diaz Cala received 38,000 unrestricted shares effective January 3, 2023. The Committee also approved cash payments of $250,000 to Rabinovitch and $85,000 to Diaz Cala, characterized as a "special bonus for the amend and extend work" on the credit facility; that is, compensation for addressing the very debt crisis that Lion Point had predicted and that the Insider Defendants' own transaction had created. The Committee additionally approved 320,000 shares to Rabinovitch. These December 2022 supplemental grants were awarded at a time when the Company was reporting net losses exceeding $100 million, yet the Board chose to award additional compensation to the very individuals whose misconduct had caused these losses.

147. The extraction continued until the eve of bankruptcy. On May 23, 2024, approximately four months before BurgerFi's Chapter 11 filing, Sternberg entered into a

Confidential Separation Agreement pursuant to which the Company granted him 600,000 unrestricted shares of common stock in exchange for his resignation as Executive Chairman. Sternberg then assigned 50% of these shares to Diaz Cala, his long-time associate and the deal's principal architect. On May 31, 2024, BurgerFi's General Counsel emailed Holland & Knight and the transfer agent: "Ophir gets the 600k per his agreement, however FDC gets 50 percent. . . . The shares need to be granted today." Even as the Company faced imminent insolvency, NASDAQ delisting proceedings, and lender forbearance negotiations, the Insider Defendants who had engineered the Anthony's Acquisition continued to extract equity from the enterprise.

148. The compensation awarded to the Insider Defendants following the Anthony's Acquisition was not justified by any legitimate business purpose or performance achievement. The Company's stock price declined continuously from the Anthony's Acquisition through bankruptcy, and every significant financial metric deteriorated following the transaction.

149. That the stock Sternberg, Diaz Cala, and Rabinovitch stood to receive in connection with the Anthony's Acquisition ultimately became worthless does not diminish the conflict of interest that infected the transaction. The relevant measure is the Insider Defendants' subjective belief and motivation when they assembled the deal, at a time when BurgerFi's stock was trading at $10 to $14 per share. They structured their compensation to include unrestricted share grants with no vesting and no lock-up in an effort to realize that value through early liquidation, not through the Company's long-term success.

**iv. The Insider Defendants Immediate Pursuit of Another Acquisition Confirmed Their Strategy of Using Growth to Enrich Themselves**

150. Before the ink was even dry on the Anthony's Acquisition, the Insider Defendants began pursuing the acquisition of another restaurant concept, Tijuana Flats, a Tex-Mex restaurant chain.

151. The proposed deal would have added 124 restaurants (106 company-owned) to BurgerFi's portfolio and would have required $120 million in new senior secured term loans. The transaction would have refinanced approximately $60 million of existing BurgerFi debt while layering an additional $120 million of new obligations on top, further leveraging BurgerFi's already distressed balance sheet and diverting management attention from addressing the Company's deteriorating financial performance.

152. In pursuing the deal, the Insider Defendants deployed the same advisors, engaging Cassel Salpeter to provide a fairness opinion and Marcum to perform a Quality of Earnings report. The same Insider Defendants tried to run the same playbook: board presentations, fairness opinions, compressed timelines, and massive debt assumptions, all without meaningful independent oversight or strategic justification.

153. The Tijuana Flats acquisition ultimately did not close, but its pursuit confirms that the Insider Defendants' strategy was focused on serial acquisitions to trigger compensation rather than on managing the Company's existing operations for the benefit of shareholders.

**I. Defendants Structured the Advisory Process to Suppress Contrary Information, and Advisor Defendants Rubberstamped their Materially Misleading Projections**

154. From the outset, the Insider Defendants controlled the advisory process in all respects: handpicking the Advisor Defendants, BTIG, a financial advisory firm, and Cassel Salpeter, a fairness opinion provider, and providing them with materially misleading projections which the Advisor Defendants simply rubberstamped.

**i. The Insider Defendants retain the Advisors.**

155. Sternberg purposefully engineered the advisory structure to maximize the appearance of independent validation. BurgerFi's outside counsel at Holland & Knight reported on July 22, 2021 that "Ophir [Sternberg] consciously made the decision to recommend two

financial firms, one to advise and one to deliver the fairness opinion." Counsel flagged the arrangement as unusual, observing that "[t]ypically the fairness opinion would be delivered by the financial advisor," and asking, "Perhaps Ophir has a reason for doing it this way?"

156. Sternberg and Diaz Cala reached out to Cassel Salpeter to provide a fairness opinion on the proposed deal. The Insider Defendants' relationship with Cassel Salpeter was personal and longstanding: President Scott Salpeter had personally placed Rabinovitch at BurgerFi, introducing him to Diaz Cala in February 2021 as someone Salpeter had known "for probably close to 20 years" and vouching for his "high quality work as a CFO," and *[Omitted pursuant to disputed confidentiality designation.]* The engagement was a limited exercise that provided the patina of validation without testing the transaction the Board actually approved.

**ii. Cassel Salpeter omits material information and repackages misinformation at the Insider Defendants' direction**

157. On its website, Cassel Salpeter boasts:

> The professionals at Cassel Salpeter & Co. have significant experience providing fairness … opinions in everything from simple acquisitions or sales to highly complex transactions, ranging in value from the low millions to the high hundred million dollars, in a broad range of industries.

158. It also acknowledges that its fairness opinions give an imprimatur of legitimacy and validity to board decisions:

> Fairness opinions are a highly effective risk-management tool in corporate transactions. Well-prepared and documented fairness opinions help boards, committees, and other fiduciaries fulfill their duties of loyalty and care by enabling them to act on an informed basis. They also provide protection under the Business Judgment Rule.

159. In its engagement letter, Cassel Salpeter specified that *[Omitted pursuant to disputed confidentiality designation.]*

160. Despite its professional commitment, Cassel Salpeter, at the Insider Defendants' direction, based its fairness analysis exclusively on the aggressive equity case projections and did not advise its client, BurgerFi's Board, of the problems it knew existed with those models.

161. In fact, the Insider Defendants provided all the data that Cassel Salpeter relied on, including the puffed up Anthony's projections, and affirmatively directed Cassel Salpeter to disregard data that would have undercut those projections.

162. For example, the Insider Defendants directed Cassel Salpeter to exclude the 2025 financial projections for Anthony's. The exclusion of 2025 projections was significant because they reflected the most aggressive growth assumptions and their inclusion would have required Cassel Salpeter to evaluate the terminal value of the business based on speculative future performance. That exclusion allowed Cassel Salpeter to avoid confronting the most obviously problematic aspects of the Insider Defendants' projections.

163. On August 22 and 23, 2021, Cassel Salpeter confirmed that "[p]ursuant to instructions from BurgerFi that the 2025 projections do not represent best available estimates and judgements as to ACFP future financial results and condition, we are only utilizing the projections through 2024." Rabinovitch responded, "Confirmed." That this material data was omitted to reach the desired result in Cassel Salpeter's fairness opinion was not disclosed to the Board.

164. The August 20, 2021 Marcum due diligence report was available to Cassel Salpeter and warned that there were "no assurances" the projected EBITDA would be achieved. The report presented the $4.4 million actual EBITDA figure alongside the $17 million projected figure. Cassel Salpeter nonetheless failed to take this into account or address it in its fairness opinion.

165. The Insider Defendants' control over Cassel Salpeter's fairness opinion extended beyond providing the numbers underlying it; they arranged *[Omitted pursuant to disputed confidentiality designation.]*.

166. *[Omitted pursuant to disputed confidentiality designation.]*

167. Cassel Salpeter's contractual right to rely on information supplied by management without conducting an independent analysis did not permit it to disregard known or apparent defects in that information, misapply the information, conceal its unreliability, or present the resulting valuation to the Board as more reliable than Cassel Salpeter knew or reasonably should have known it to be.

168. Indeed, although Cassel Salpeter used financial projections supplied by management via the Insider Defendants, its engagement required more than the mechanical incorporation of those projections into valuation models. Cassel Salpeter independently undertook to evaluate the Anthony's Acquisition and advise the Board whether the consideration to be paid was fair to the Company from a financial point of view. In performing that undertaking, Cassel Salpeter was required to exercise the care, competence, and professional judgment ordinarily exercised by reasonably prudent providers of fairness opinions; understand and critically evaluate the material assumptions underlying management's projections; identify facial inconsistencies, unsupported assumptions, departures from the Company's historical performance, and other material red flags; conduct appropriate sensitivity and alternative-case analyses; apply accepted valuation methodologies accurately and consistently; and fairly disclose to the Board all material limitations, uncertainties, and contrary information affecting its analysis.

169. When asked about the fairness opinion, Scott Salpeter testified *[Omitted pursuant to disputed confidentiality designation.]* This description of its services begs the question: What

was the point of the Cassel Salpeter fairness opinion? Indeed, if Cassel Salpeter merely rubberstamped the Insider Defendants' inflated numbers and had no independent duty to notify the Board of known problems with those numbers, it appears its only real purpose was to wrap the Insider Defendants' materially misrepresented projections in a blanket of legitimacy.

170. Cassel Salpeter's blind acceptance of projections from the Insider Defendants was a critical failure in the process that was supposed to protect the Board and shareholders from insiders' breaches of duties of care and loyalty. Instead, Cassel Salpeter bent to the will of Diaz Cala and the other Insider Defendants, helping them shield material information from the Board, while its engagement provided a false sense of security that the transaction had been vetted by qualified professionals.

**iii. BTIG omits material information and repackages misinformation at the Insider Defendants' direction**

171. The Insider Defendants also retained investment banking firm BTIG to act as the Company's financial advisor in connection with the Anthony's Acquisition. *[Omitted pursuant to disputed confidentiality designation.]*

172. Daniel Shea, BTIG's managing director, testified that the Board materials were management's work product, not an independent analysis. He stated the decisions to update the Board presentation and the comments and edits to the board decks came from Mike Rabinovitch and Faquiry Diaz, that the "[a]uthor of the materials [the deck that was presented to the board] would have been BurgerFi Management," and that BTIG "was putting in the document what was provided to us by BurgerFi."

173. The presentation the Board received was, in substance, the Insider Defendants' numbers dressed in an investment banking firm's letterhead. The Insider Defendants reviewed and approved all content in BTIG's Board presentation before it was presented to the Board. Although

Shea testified he would not refer to BTIG's Board presentation as an independent presentation, there is no indication that this important fact was made clear to the Board.

174. Just like Cassel Salpeter, BTIG was fed the materially misleading Anthony's projections, and just like Cassel Salpeter, BTIG had no problem passing that information on to the Board under the guise of an independent evaluation. Any concerns it had it raised only in discussions with Insider Defendants, not with the Board.

175. Critically, BTIG *[Omitted pursuant to disputed confidentiality designation.]* causing Diaz Cala to slightly scale back, advising BTIG: "Pls use 22x as the multiple. With $1.5mm in synergies." *[Omitted pursuant to disputed confidentiality designation.]*

176. *[Omitted pursuant to disputed confidentiality designation.]* This presentation formed a material basis for the Board's approval of the Anthony's Acquisition.

177. BTIG notably had its own motivation to present a positive picture of Anthony's to the Board: *[Omitted pursuant to disputed confidentiality designation.]*

**J. Insider Defendants swiftly seek Board approval through a compressed process.**

178. Having procured the relevant advisors, the Insider Defendants then swiftly sought Board approval through a compressed process. On September 22, 2021, Holland & Knight prepared a timeline that mapped a four-day approval sprint: the first Board meeting on Friday, September 24 to present deal documents; a voting meeting on Sunday, September 26; an all-hands call that evening to confirm the vote and circulate signature pages; and release of signature pages and a press release on Monday, September 27. The entire process, from the Board's first review of deal documents to public announcement, was designed to occur within 72 hours.

179. The compressed timeline was inconsistent with the careful deliberation that a $161 million debt-financed acquisition demanded. On September 23, 2021, Sternberg emailed the Board an updated presentation and called two Board meetings for the September 24 and 26. Materials

beyond the attached presentation would be circulated "in a subsequent email prior to the Friday meeting."

180. The Board was thus given approximately 24 hours' notice of the first meeting and even less time to review the transaction documents. The directors were expected to evaluate and vote on a transaction worth $161 million, requiring the assumption of substantial debt within 48 hours.

181. The September 24, 2021 Board meeting minutes confirm the scope and pace of the Insider Defendants' compressed process. The meeting convened at approximately 4:05 pm EDT with one director, Martha Stewart, absent. During the session, Holland & Knight walked the Board through the full suite of transaction documents, including the Stock Purchase Agreement, Registration Rights Agreement, Certificate of Designation for Series A Preferred Stock, Support and Voting Agreements, and the Regions Bank Credit Agreement. The meeting adjourned at approximately 5:20 pm EDT, meaning the Board, less one director, reviewed the entire documentary framework for a $161 million acquisition in approximately 75 minutes.

182. Representatives of BTIG were present at every Board meeting at which the Anthony's Acquisition was discussed. Representatives of Cassel Salpeter were present at all but the September 24 meeting.

183. The Board initially voted to approve the acquisition (which at that point also required shareholder approval) on September 27, 2021. The September 27 meeting lasted approximately two hours, during which Holland & Knight walked through proposed resolutions regarding approval of the transaction, the purchase agreement, collateral agreements, and related items, Cassel Salpeter delivered the oral fairness opinion, Rabinovitch presented financial analyses, and the Board voted to approve the acquisition.

184. After being forced to restructure the deal to avoid a shareholder vote, the Insider Defendants scheduled another board meeting for October 8, 2021 to get Board approval for the Acquisition on the new terms. On October 7, 2021, at 10:38 p.m., director Mann emailed Sternberg, Diaz Cala, and the rest of the Board, asking, *inter alia*, whether the Board could receive "the materials and summary of changes" that same night "so we have enough time to review and consider beforehand."

185. The following morning, October 8, 2021, at 10:03 a.m., Sternberg confirmed that the Board meeting would proceed at 3:00 p.m. that day. Less than an hour before the meeting, Holland & Knight circulated a zip file containing the transaction documents, including redlines, and advised that additional documents would follow. Diaz Cala, in turn, directed Holland & Knight to send the calendar invitation, Zoom link, and board materials, but specifically instructed counsel to "send calendar invite first for 3 pm."

186. On October 8, 2021, at 3:00 p.m., the Board held a meeting by videoconference concerning the Anthony's Acquisition. The meeting was called to order at approximately 3:05 p.m. and adjourned at approximately 4:05 p.m., after roughly one hour.

187. The October 8 meeting addressed the Insider Defendants' restructuring of the Acquisition to eliminate stockholder approval, not a new independent review. A lawyer from Holland & Knight, Enrique Conde, told the Board that stockholder approval was no longer required and that the transaction could close sooner because the preferred shares issued as consideration had been made non-convertible, keeping the issuance below NASDAQ's 20% threshold.

188. The meeting minutes recorded the following sequence: Conde walked through the deal-structure changes; Rabinovitch discussed only "minor updates to financial projections"; and

Salpeter provided an "update regarding Cassel's analysis with respect to the fairness opinion previously provided." Conde then walked through proposed resolutions superseding those approved on September 27, and the Board approved them. The entire sequence, from deal-structure changes, to limited financial and fairness updates, to approval, occupied approximately one hour.

189. Gregory Mann, a director, objected that the Board had not received adequate materials to evaluate the restructured transaction but his objection was overruled.

190. The inadequacy of the Board process was confirmed by the Company's own lender. On October 30, 2021, counsel for the lending group wrote to Holland & Knight that the BurgerFi board resolutions authorizing the acquisition were "not sufficient" because the statement that "the Board has reviewed . . . [all documents] to be executed and delivered in connection with the Acquisition" was "not factually accurate – the drafts weren't even started at the time the resolutions were approved." The lender's counsel proposed either pre-closing resolutions specifically covering the debt documents or post-closing "supplementary resolutions" to ratify entry into agreements the Board had never seen.

## III. THE ANTHONY'S ACQUISITION IS SUBJECT TO ENTIRE FAIRNESS REVIEW

191. The Anthony's Acquisition must be evaluated under the entire fairness standard of review because (1) the self-interested Insider Defendants wrongfully manipulated the Board's deliberative process regarding the Anthony's Acquisition thus disabling the directors' ability to exercise independent business judgment; and, alternatively (2) Sternberg was a controlling stockholder who received a non-ratable benefit.

192. Entire fairness review applies because the Insider Defendants wrongfully manipulated the board's decision-making process by committing the Material Misrepresentations enumerated herein.

193. Each of the Material Misrepresentations concerned financial information, manipulation, and conflicts which necessarily undercut the Board's approval of a $161 million debt-financed acquisition. The information withheld was not collateral or post-closing in nature.

194. A reasonable director would have regarded the withheld information as manipulated and significant to the Board's evaluation and approval decision.

195. Entire fairness also applies because Sternberg controlled the transaction itself. He initiated contact with L Catterton, drove negotiations, personally oversaw the engagement of advisors through Diaz Cala, directed the pace and timing of the deal to meet his RSU vesting deadline, and directed the restructuring of the transaction to avoid a shareholder vote after Lion Point's opposition.

196. Sternberg, Greenfield, and Diaz Cala, together with Sternberg-controlled entities Lionheart Capital and Lionheart Equities, acted as a controlling stockholder group that dominated the Company both generally and, specifically, with respect to the process and terms of the Anthony's Acquisition.

197. Sternberg exercised control over BurgerFi through multiple mechanisms, including: (a) the Director Voting Agreement giving him the right to designate a majority of Board nominees; (b) his 15.3% equity ownership; (c) his position as Executive Chairman; and (d) his placement of Greenfield and Diaz Cala in key management and Board positions.

198. The Director Voting Agreement was not merely a dormant contractual right. In practice, Sternberg and Lionheart Capital actively wielded the voting authority it conferred, and even exceeded it at times. For example, on August 27, 2021, Lionheart Capital's General Counsel, operating from Lionheart's offices at Sternberg's direction, cast votes at BurgerFi's annual

meeting on behalf of six separate shareholder entities including Lion Point. Sternberg personally confirmed this exercise, and Diaz Cala initiated the engagement with the proxy agent.

199. On November 3, 2021, the date the Anthony's Acquisition closed, a new Voting Agreement was executed that further consolidated Sternberg's control over the Company. This agreement ensured that Sternberg would maintain control over Board composition even after the Anthony's Acquisition diluted his equity percentage.

200. Sternberg exercised actual control over the board of directors during the course of the Anthony's Acquisition. He did not recuse himself from the voting and did not leave the decision making to an independent committee. Instead, holding the largest single block of stock in the Company and armed with the Director Voting Agreement, Sternberg controlled the composition of the Board, which approved the transaction, especially Board member Greenfield, a longtime associate and current officer of Sternberg's company, Lionheart Capital.

201. Importantly, despite his interest in the transaction, neither Sternberg nor his close associate Greenfield recused themselves from voting on the transaction, and each voted to approve the Anthony's Acquisition. Sternberg chaired the Board throughout, personally presented the Company's response to Lion Point's letter, personally emailed the Board the updated presentations that formed the basis for the September 2021 meetings, and personally participated in every Board meeting at which the Anthony's Acquisition was discussed. Greenfield voted for the Anthony's Acquisition as part of the Board and also approved Sternberg and Diaz Cala's compensation associated with the transaction, while keeping them apprised of internal compensation committee deliberations.

## IV. ANTHONY'S AFTERMATH: COLLAPSE AND INSOLVENCY

### A. Burger Fi Collapses

202. The Anthony's Acquisition closed on November 3, 2021 and rendered the Company insolvent as memorialized in its end of year balance-sheet the following month.

203. Before the Anthony's Acquisition as of September 30, 2021, BurgerFi had approximately $28.3 million in cash, $677,000 in debt, and positive stockholders' equity.

204. After the Anthony's Acquisition, the Company was burdened with approximately $161 million in acquisition-related obligations and immediately began hemorrhaging cash. BurgerFi's segment 2022 adjusted EBITDA was negative $134,000; Anthony's segment net loss was approximately $53 million; and total Company 2022 net loss was $103.4 million.

205. BurgerFi's tangible net worth fell from positive $26.6 million at September 30, 2021 to negative $93.4 million at December 31, 2021, a decline of $120.1 million. Substantially the entire decline, approximately $118.9 million, is attributable to the Anthony's Acquisition.

206. Based on Anthony's actual trailing EBITDA of $4.7 million and market-comparable multiples of approximately 10.5x, Anthony's was worth approximately $49 million before accounting for its debt. BurgerFi paid approximately $161 million for Anthony's, representing an overpayment of approximately $112 million.

207. By January 2, 2023, BurgerFi reported negative stockholders' equity of approximately $20.9 million.

### B. Subsequent Performance Vindicated Lion Point's Warnings and Proved the Projections the Board were fed were Baseless

208. Anthony's actual post-acquisition financial performance demonstrated conclusively that the projections used to justify the Anthony's Acquisition were grossly inflated

and unreliable, and that the warnings raised by Lion Point before closing were entirely well-founded.

209. Anthony's 2022 adjusted EBITDA was approximately $9.3 million, compared to the projected $17.3 million presented to the Board. This represented a shortfall of approximately 46% below the projected figure.

210. BurgerFi's legacy restaurant segment generated 2022 adjusted EBITDA of negative $134,000, compared to the projected approximately $11 million. The combined 2022 adjusted EBITDA was approximately $9.2 million, roughly one-third of the $28.3 million presented to the Board.

211. BurgerFi reported an accumulated deficit of approximately $208.1 million as of January 1, 2024. The Company's stock price declined from approximately $10-$14 per share at the time of the Acquisition to less than $0.10 per share before the bankruptcy filing.

212. Anthony's segment net loss for fiscal year 2022 was approximately $53 million. The total 2022 net loss for the combined company was approximately $103.4 million.

213. The catastrophic divergence between projected and actual performance reflected the fundamental unreasonableness of the projections used to justify the Anthony's Acquisition, which the Insider Defendants knew were unreliable at the time they were presented to the Board.

214. Each specific concern raised by Lion Point in its August 31, 2021 letter was subsequently validated by actual results. Lion Point predicted that the Anthony's Acquisition terms were excessive relative to Anthony's actual earning capacity. Lion Point predicted that the projections were unreliable and could not support the transaction. As outlined above, each of these predictions were proven correct.

215. Lion Point warned that the debt assumed to acquire Anthony's "could function like a noose around the neck of BurgerFi." The shareholder's warning proved prescient. The debt incurred in the Acquisition became a crushing financial burden, constraining the Company's operations and accelerating its ensuing decline. By January 2024, the Company had missed principal and interest payments and received default notices from its lenders. The Company's immediate post-closing insolvency and inability to service its approximately $161 million in acquisition-related obligations confirmed this warning precisely.

216. Lion Point warned that the transaction was being driven by management self-interest. The subsequent disclosure of deal-contingent compensation and the Insider Defendants' continued diversion of corporate resources for their personal benefit confirmed this warning.

217. BurgerFi's own management later confirmed that the harm to the Company was attributable to Sternberg's and Lionheart's leadership. In May 2024, in connection with negotiations to remove Sternberg from the Board, BurgerFi's newly installed Chief Executive Officer Carl Bachmann assessed that "insiders/closely held investors including franchisees have been adversely hurt by LH [Lionheart] leadership" and that the "[r]emoval of LH sends a message to the investment community that we are making important board changes, given LH's history/performance in the capital markets."

218. Greenfield was deliberately excluded from the Board's deliberations concerning Sternberg's separation agreement. Bachmann wrote to the other directors: "I have left Allison off the Board call and this email for obvious conflict issues. I will debrief her afterwards depending on the final decision." The Board's own contemporaneous recognition that Greenfield could not participate in decisions affecting Sternberg and Lionheart because of "obvious conflict issues" confirms that Greenfield was not independent of Sternberg at any time during the relevant period.

**C. The Insider Defendants caused insolvent BurgerFi to enter into an onerous lease that benefits Sternberg**

219. In furtherance of their scheme to divert corporate resources for his personal benefit, Sternberg caused the Company to enter into lease agreements for office space at terms that benefited Sternberg's personal real estate interests at the Company's expense.

220. In January 2022, BurgerFi terminated its 3-year lease for corporate office space located in North Palm Beach, Florida. The rent for that lease was $200,000 for the years 2020 and 2021.

221. That same month, Cypress Creek Holdings, a holding company controlled by Sternberg and Lionheart Capital, purchased a commercial building located at 200 W. Cypress Creek Road, Fort Lauderdale, Florida. Diaz Cala negotiated that $14.5 million purchase.

222. Sternberg then caused BurgerFi to enter into a lease for office space in this building with lessor, Cypress Creek Holdings, on terms that were, upon information and belief, above market rates and provided no legitimate business justification. Rabinovitch and (despite the fact that this move was neither a "merger" nor an "acquisition") Diaz Cala, negotiated the lease on BurgerFi's behalf.

223. The lease between BurgerFi and Cypress Creek Holdings (the "BurgerFi-Cypress Creek Lease") was subject to an onerous ten-year term and required BurgerFi to pay rent that escalated significantly over the term, for required expansions of office space that, upon information and belief, BurgerFi did not need. In 2022, BurgerFi paid approximately $500,000 in rent under this lease. In 2023, rent payments increased to approximately $700,000.

224. Diaz Cala, along with Rabinovitch, negotiated the BurgerFi-Cypress Creek Lease on behalf of BurgerFi, without meaningful independent oversight or any attempt to solicit competing proposals from unaffiliated landlords.

225. The Board approved the BurgerFi-Cypress Creek Lease without obtaining an independent appraisal of fair market rent for comparable space or conducting any analysis of whether the lease terms were consistent with BurgerFi's interests.

226. The BurgerFi-Cypress Creek Lease represented a direct transfer of value from BurgerFi to another company controlled by Sternberg at a time when BurgerFi was insolvent.

227. In May 2024, when the Board negotiated Sternberg's exit from BurgerFi, the new Board Chairman noted the insider status of the lessor, as the Board notes reflect that "the landlord . . . is an entity that is controlled by Mr. Sternberg" and payments made to it would likely be viewed in bankruptcy as "payments to an insider of the Company."

228. The conflicted lease arrangement is part of the pattern of self-dealing through which the Insider Defendants misappropriated corporate assets for their benefit of Sternberg and his related entities.

## <u>CLAIMS FOR RELIEF</u>

### COUNT I: BREACH OF FIDUCIARY DUTIES - DUTY OF CARE AND DUTY OF LOYALTY AGAINST RABINOVITCH

**(Governing Law: Delaware law pursuant to the internal affairs doctrine.)**

229. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

230. At all relevant times, in his capacity as BurgerFi's Chief Financial Officer, Rabinovitch owed fiduciary duties to the Company. Those duties required him to act loyally, in good faith, and with due care to protect and promote the value of the corporate enterprise. Upon consummation of the Acquisition, the Company became insolvent with its value destruction ultimately borne by its creditors. Although BurgerFi's corporate charter exculpates *directors* from

monetary liability for duty-of-care claims, it does not bar such claims against Rabinovitch, as at all relevant times, he was acting in his capacity as an *officer* of the Company.

231. Under Section 4.6 of BurgerFi's Third Amended and Restated Bylaws, Rabinovitch, as CFO, had "general supervision, direction and control of the financial affairs of the Corporation." In the absence of a named Treasurer, Rabinovitch also assumed the Treasurer's duties under Section 4.10, including the obligation to "render to the President and the Board of Directors … an account … of the financial condition of the Corporation."

232. Rabinovitch was grossly negligent by failing to act as the gatekeeper for BurgerFi's financial information in connection with the Anthony's Acquisition, specifically by failing to provide the board with an accurate account of material financial information relative to the Anthony's Acquisition. Rabinovitch also acted disloyally and thereby breached his duty of loyalty, by allowing his personal financial interests in deal-contingent compensation to take precedence over the interests of BurgerFi and its creditors.

233. Rabinovitch was intentionally involved in the Material Misrepresentations to the Board.

234. Among other things, Rabinovitch prepared, approved, or permitted the use of projections and deal materials that presented Anthony's as a desirable acquisition target while omitting material adverse facts available to BurgerFi before signing and closing, including Anthony's post-2017 decline, 2019 losses, loan covenant default, and lender forbearance.

235. Rabinovitch knew or should have known that the statement that Anthony's revenue had grown at a 12% compound annual growth rate from 2011 to 2019 was misleading because it concealed that Anthony's had grown rapidly only through 2017 and had begun declining before COVID-19 for the more critical recent period of 2017 to 2019.

236. Rabinovitch breached his duty of care by failing to ensure that the Board and advisors received a complete and accurate presentation of Anthony's financial condition, including the information reflected in the audited financial statements that existed months before the Acquisition agreement was signed.

237. Rabinovitch also breached his duty of care by causing the Board to approve the Anthony's Acquisition without disclosing that alternative, more conservative projections had been prepared.

238. Rabinovitch abdicated his duties as Chief Financial Officer by allowing Diaz Cala, an independent contractor with limited formal authority and no comparable officer-level responsibility for BurgerFi's financial reporting or fiduciary duties and knowingly allowed him to control, manipulate, and suppress material information to the Board, thus tainting the Board's deliberative process.

239. Rabinovitch further breached his duty of care by failing to provide independent financial oversight of the BurgerFi-Cypress Creek Lease and by permitting BurgerFi to assume above-market and unnecessary lease obligations to a Lionheart-affiliated entity at a time when BurgerFi was insolvent.

240. Rabinovitch breached his duty of loyalty by participating in an Acquisition process that generated deal-contingent stock grants and bonuses for himself and other Insider Defendants to the detriment of public stockholders.

241. Rabinovitch's material self-interest was substantial and quantifiable. His total equity compensation comprised: (a) 130,000 KPI-based RSUs, of which 50% of each annual tranche was mechanically guaranteed to vest by the Anthony's Acquisition-driven EBITDA achievement; (b) 100,000 Benchmark RSUs tied to stock price thresholds of $19.00 to $25.00 per

share, which proved worthless due to the stock price collapse, making the KPI RSUs Rabinovitch's sole meaningful equity compensation; (c) 75,000 RSUs accelerated from 2024 and 2025 into 2023 vesting through a private negotiation with Sternberg approved in eight days by Written Consent; (d) 174,613 unrestricted shares awarded in December 2021 solely for closing the Acquisition; and (e) a salary increase from $240,000 to $400,000 negotiated privately with the conflicted Sternberg. These amounts, individually and collectively, were material relative to Rabinovitch's total annual cash compensation and created a personal financial interest sufficient to make it improbable that Rabinovitch could perform his fiduciary duties without being influenced by his overriding personal interest in the Anthony's Acquisition.

242. Rabinovitch's breaches were not the product of good faith business judgment and were at least grossly negligent. His conduct reflected conscious disregard of his officer-level responsibilities, willful blindness to material financial red flags, and loyalty conflicts arising from his personal interest and failure to act independently. With respect to the allegations sounding in loyalty, his conduct was willful, knowing, and in conscious disregard of his fiduciary obligations; alternatively, the same conduct constituted a conflicted process and reflected reckless disregard, willful blindness, and failure to act independently.

243. As a direct and proximate result of Rabinovitch's breaches of fiduciary duty, BurgerFi consummated the Anthony's Acquisition on materially misleading information, paid a grossly inflated price, incurred acquisition-related debt and obligations it could not sustain, incurred wasted transaction and advisory fees, continued avoidable onerous and unnecessary related-party lease payments, and suffered loss of corporate value, impaired operations, and insolvency.

## COUNT II: BREACH OF FIDUCIARY DUTY - DUTY OF LOYALTY AGAINST STERNBERG AND GREENFIELD

**(Governing Law: Delaware law pursuant to the internal affairs doctrine.)**

244. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

245. At all relevant times, as BurgerFi directors, Sternberg (Chairman of the Board) and Greenfield owed fiduciary duties to the Company. Those duties required them to act loyally, in good faith, and with due care to protect and promote the value of the corporate enterprise. Upon consummation of the Acquisition, the Company became insolvent with its value destruction ultimately borne by its creditor.

246. BurgerFi's corporate charter exculpates directors from monetary liability for breaching their duty of care to the Company, but no such exculpation exists for breaching their duty of loyalty.

247. Sternberg's and Greenfield's duties of loyalty required them to place BurgerFi's interests ahead of their own, or anyone else's interests.

248. As a direct and proximate result of Sternberg's and Greenfield's breaches of the duty of loyalty, BurgerFi and its stakeholders suffered the corporate damages set forth herein.

**A. Sternberg**

249. Sternberg breached his duty of loyalty by causing BurgerFi to pursue and consummate the Anthony's Acquisition to trigger insider stock compensation to himself and others loyal to him. Sternberg's interest in pursuing the Anthony's Acquisition was to quickly expand BurgerFi's revenue base, thus triggering the release of stock that he could sell before BurgerFi collapsed under the weight of the Anthony's debt burden. To this end, Sternberg's interests were not aligned with the long term health and profitability of the Company and its stakeholders.

250. Sternberg was intentionally involved in the Material Misrepresentations to the Board and in fact chose not to recuse himself but rather cast a vote in favor of the Anthony's Acquisition.

251. Sternberg also breached his duty of loyalty by causing BurgerFi to enter into the BurgerFi-Cypress Creek Lease on unfair terms that diverted corporate resources to a Lionheart-affiliated entity, thus benefitting his personal real estate interests at BurgerFi's expense.

**B. Greenfield**

252. Greenfield breached her duty of loyalty by favoring Sternberg's and Lionheart's interests over BurgerFi's interests. Sternberg installed Greenfield as the chair of two of the Board's three committees: the Nominating Committee and the Compensation Committee. Greenfield was a founding partner and served as the Chief Development Officer of Sternberg's Company, Lionheart Capital and had longstanding professional and financial compensation ties to Sternberg and his entities, and was not independent of Sternberg when she supported and voted in favor of the Anthony's Acquisition and in favor of associated compensation to Sternberg, Rabinovitch, and Diaz Cala.

253. *[Omitted pursuant to disputed confidentiality designation.]*. Post-Anthony's, her connections to Sternberg were noted by BurgerFi's new CEO to be an "obvious" conflict of interest that precluded her from matters in which Sternberg would benefit.

254. Greenfield also failed to insist on independent review of the BurgerFi-Cypress Creek Lease.

255. Greenfield's lack of independence from Sternberg was not a matter of mere structural overlap between her Lionheart employment and her BurgerFi directorship. It was a disqualifying conflict that persisted throughout the relevant period and was ultimately acknowledged by the Board itself.

### C. Breaches of the Duty of Care as Predicate Acts

256. The following allegations are not pleaded to impose monetary liability on Sternberg or Greenfield for any direct claim for breach of the duty of care, which BurgerFi's charter exculpates as to directors. They are pleaded solely to establish the predicate fiduciary breach necessary to support the aiding-and-abetting claims asserted elsewhere in this Complaint.

257. Sternberg breached his duty of care by permitting and causing BurgerFi's Board to approve the Anthony's Acquisition through a rushed and materially manipulated process managed by a conflicted independent contractor who had no duty to the Company and reported only to him. As alleged above, Sternberg personally directed unsupported revenue assumptions, chaired and participated in every Board meeting concerning the transaction, allowed the Board to proceed without analysis of whether the combined company could service the debt it was assuming, and pushed the restructured transaction forward on inadequate notice without disclosing the deal component that was most relevant to him: his revenue-based stock grants. Ultimately, Sternberg supported and voted in favor of the Acquisition despite his undisclosed conflict and the known problems.

258. Greenfield breached her duty of care by supporting and voting to approve the Anthony's Acquisition without insisting on a disinterested process, adequate information, or meaningful independent review, despite the conflicts and process defects alleged above.

## COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST DIAZ CALA, THE IVY COMPANIES, CASSEL SALPETER, AND BTIG

**(Governing Law: Delaware law pursuant to the internal affairs doctrine because this claim is derivative of the pleaded Delaware fiduciary-duty breaches.)**

259. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

260. Under Delaware law, pursuant to the internal affairs doctrine, a claim for aiding and abetting breach of fiduciary duty requires: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the non-fiduciary defendant; and (iv) damages proximately caused by the breach.

261. The first element is satisfied because BurgerFi's Board owed fiduciary duties of care and loyalty to BurgerFi. The second element is satisfied because, as alleged above, the Board breached those duties by approving the Anthony's Acquisition on materially incomplete and misleading information and by allowing conflicted insiders to control the process and prioritize their own interests over BurgerFi's interests.

262. As set forth above, Rabinovitch breached his duties of care and loyalty to BurgerFi, and Sternberg and Greenfield also breached their duties of care and loyalty to BurgerFi although they can only be held responsible for monetary damages for the latter.

**A. Diaz Cala and The Ivy Companies**

263. Diaz Cala individually and through his consulting vehicle, the Ivy Companies, knew the Fiduciary Defendants were breaching their fiduciary duties and aided and abetted those breaches by taking over and directing the Anthony's Acquisition process despite his status as an "independent contractor" with limited formal authority. Diaz Cala controlled communications with advisors and the Board, pushed the aggressive, inflated projections and transaction timetable, and usurped Rabinovitch's CFO responsibilities to advance the Acquisition for the benefit of Sternberg, the loyal Rabinovitch, and himself, causing the damages to the Company asserted herein.

**B. Cassel Salpeter**

264. Cassel Salpeter knew the Fiduciary Defendants were breaching their financial duties and aided and abetted the breaches by providing a "fairness opinion" that it knew or should

have known (1) contained material misstatements and omissions; and (2) would be used to justify an unfair transaction. Cassel Salpeter knew that the Insider Defendants' projections omitted material adverse information concerning Anthony's financial condition, permitted the Insider Defendants to pre-screen and shape the opinion, and issued its opinion to the Board without warning or qualification and despite the unreliability of the projections and the process supporting them.

**C. BTIG**

265. BTIG knew the Fiduciary Defendants were breaching their fiduciary duties and aided and abetted the Fiduciary Defendants' breaches by serving as the Board's financial advisor and orchestrating a BTIG presentation to the Board that BTIG knew contained material misstatements and omissions. BTIG inflated projections in this Board presentation.

266. BTIG had actual knowledge that the Fiduciary Defendants were breaching their duties and knowingly participated in those breaches. Specifically, BTIG: (a) participated in email exchanges confirming the existence of materially different projection cases and the intent to present the aggressive case to the Board while maintaining its own working spreadsheet documenting the discrepancy between the Board and Lender figures; (b) accepted direction on critical valuation assumptions from Diaz Cala, whom BTIG knew was not an officer of BurgerFi but rather "worked more for Lionheart than directly operating at BurgerFi"; (c) was present at every Board meeting at which the Acquisition was discussed and observed the compressed timeline, the absence of independent analysis, and the Board's failure to ask questions; and (d) removed information from the Board deck at the Insider Defendants' direction without alerting the Board to the significance of the removals.

267. BTIG's conduct created an "informational vacuum" that prevented the Board from exercising informed business judgment. A financial advisor may be liable for aiding and abetting

when it knows the Board is breaching its duty of care and participates by misleading the Board or creating such an informational vacuum. BTIG's knowing repackaging of management's manipulated numbers, participation concealing material information from the Board, implementation of insider-directed valuation assumptions, and removal of material information constituted knowing substantial assistance.

268. *[Omitted pursuant to disputed confidentiality designation.]* BTIG had reason to refrain from providing the Board with information that might jeopardize closing. Diaz Cala and The Ivy Companies, Cassel Salpeter, and BTIG had actual knowledge of the fiduciary breaches alleged herein or were willfully blind to those breaches. Each provided substantial assistance that enabled the breaches to occur, including by controlling the transaction process, facilitating conflicted related-party dealings, or lending professional credibility to a transaction driven by insider self-interest.

269. As a direct and proximate result of the aiding and abetting by Diaz Cala and The Ivy Companies, Cassel Salpeter, and BTIG, BurgerFi's Board approved the Anthony's Acquisition on materially incomplete and misleading information, causing BurgerFi to suffer the damages set forth herein.

**COUNT IV: PROFESSIONAL NEGLIGENCE / NEGLIGENT MISREPRESENTATION AGAINST CASSEL SALPETER**

**(Governing Law: Florida law.)**

270. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

271. Cassel Salpeter was engaged to provide an independent fairness opinion to BurgerFi's Board of Directors in connection with the Anthony's Acquisition. In providing that opinion, Cassel Salpeter owed a duty of professional care to BurgerFi.

272. Cassel Salpeter knew or should have known that BurgerFi's Board would rely on its fairness opinion in deciding whether to approve the Acquisition. The fairness opinion was specifically intended to assist the Board in fulfilling its fiduciary duty of care.

273. Cassel Salpeter owed the Company a duty, arising from its professional undertaking and engagement, to exercise the degree of care, competence, diligence, and professional judgment ordinarily exercised by reasonably prudent providers of fairness opinions under the same or similar circumstances.

274. The opinion represented that the Acquisition was fair from a financial point of view when Cassel Salpeter knew or should have known that the financial information supporting that conclusion was based on unreliable projections, excluded material information, and was compromised by management interference. These failures constitute gross negligence, reckless disregard, willful blindness, and failure to act independently.

275. Specifically, Cassel Salpeter was grossly negligent and breached its duty of professional care by, among other things:

a. including EBITDA projections provided by the Insider Defendants, which assumed a 286% increase over trailing performance without adequate factual basis warning or qualification;

b. relying, at the Insider Defendants' direction, on the more aggressive Anthony's equity-case projections in its analysis of Anthony's without adequate factual basis, warning, or qualification;

c. excluding 2025 projections from its analysis at the Insider Defendants' direction, without disclosing to the Board the significance of this exclusion or its impact on the terminal value analysis;

d. applying a terminal value multiple to projected EBITDA without questioning whether the underlying growth assumptions were achievable or consistent with industry norms;

e. failing to alert the Board that the Insider Defendants had *[Omitted pursuant to disputed confidentiality designation.]*, compromising the independence upon which the Board was entitled to rely; and

f. issuing its opinion repackaging the Insider Defendants' materially misleading financial information without warning or qualification, despite having access to Marcum's due diligence report and audited financial statements that reflected Anthony's 2019 losses, goodwill impairment, and loan covenant default, and despite Marcum's explicit warning that there were "no assurances" the projected EBITDA would be achieved.

276. The Board foreseeably relied, or a reasonable board member would have relied, on Cassel Salpeter's "independent" fairness opinion passing a resolution stating that "the Board unanimously determines that the Acquisition is at a price and on terms that are fair to, advisable and in the best interests of the Company and its stockholders." As a direct and proximate result of Cassel Salpeter's professional negligence and negligent misrepresentations, BurgerFi's Board approved an Acquisition that it would not have approved absent the fairness opinion, causing BurgerFi to suffer damages as set forth herein including the tangible net worth decline, increased debt burden, wasted transaction and advisory fees, impaired operations, and insolvency.

**COUNT V: PROFESSIONAL NEGLIGENCE AGAINST BTIG, LLC**

**(Governing Law: Florida law.)**

277. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

278. BTIG was engaged to provide professional financial advisory services to BurgerFi's Board of Directors in connection with the Anthony's Acquisition. In providing those services, BTIG owed a duty of professional care to BurgerFi.

279. BTIG was in privity with BurgerFi through its direct engagement by the Company's Board of Directors. BTIG's engagement letter stated that its "financial advice and opinions are intended solely for the benefit and use of the board of directors of the company," establishing the requisite professional relationship between BTIG and BurgerFi.

280. BTIG owed the Company a duty, arising from its professional undertaking and engagement, to exercise the degree of care, competence, diligence, candor, and professional judgment ordinarily exercised by reasonably prudent investment bankers under the same or similar circumstances.

281. BTIG breached that duty by, among other things: (1) promoting and structuring the Anthony's Acquisition based on materially overstated and unreliable insider projections; (2) failing to disclose known and apparent defects in those projections; (3) failing to provide the Board with a balanced analysis of the Anthony's Acquisition's risks, financial consequences, and reasonably available alternatives; (4) withholding or minimizing information that weighed against the Anthony's Acquisition; (5) accepting direction on critical valuation assumptions from a conflicted insider who was not an officer, director, or employee of the Company; (6) implementing insiders' directives to remove financial information from board materials without independently assessing whether the removals deprived the board of material information; (7) failing to alert the board that management selected the most aggressive available projections for the Board presentation without disclosing that alternative projections were prepared; and (8) allowing its transaction-contingent compensation to influence its analyses and recommendations.

282. The Board foreseeably relied, or a reasonable board member would have relied, on BTIG's materially incomplete and misleading presentation in approving the Acquisition. As a direct and proximate result of BTIG's professional negligence, BurgerFi's board approved the Anthony's Acquisition on materially incomplete and misleading information, causing BurgerFi to suffer damages including the tangible net worth decline, increased debt burden, wasted transaction and advisory fees, impaired operations, and insolvency.

**COUNT VI: DISGORGEMENT (EQUITABLE ALTERNATIVE REMEDY) AGAINST STERNBERG, GREENFIELD, AND RABINOVITCH**

**(Delaware Law)**

283. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

284. This Count is expressly pleaded in the alternative to the compensatory damages counts and seeks equitable relief only. Plaintiff does not seek disgorgement as an independent or duplicative measure of corporate damages, but seeks an accounting and equitable disgorgement of benefits, if any, that Fiduciary Defendants received or retained through conflicted conduct or disloyalty.

285. At all relevant times, Sternberg, Greenfield, and Rabinovitch owed a duty of loyalty to BurgerFi under Delaware law by virtue of their positions.

286. During the relevant period, the Fiduciary Defendants were conflicted fiduciaries or acted while in breach of their duties of loyalty. They placed their personal interests and the interests of other related parties, ahead of BurgerFi's interests and acted with divided loyalty in connection with the Anthony's Acquisition, the BurgerFi-Cypress Creek Lease, insider compensation, and/or related transactions.

287. Equitable disgorgement is warranted as an alternative remedy because a fiduciary may not retain profit, compensation, or any other benefit obtained while acting with divided loyalty or in breach of the duty of loyalty. It would be inequitable to allow the Disgorgement Defendants to retain economic benefits obtained through their conflicted conduct at BurgerFi's expense.

288. Each Fiduciary Defendant received or retained identifiable economic benefits during the period of disloyalty, including compensation, fees, bonuses, separation benefits, consulting fees, lease-related benefits, or other economic benefits obtained from or through BurgerFi or the insider-controlled transactions. These benefits are identified as potential equitable disgorgement targets and as evidence of the conflicted process; they are not alleged as the sole measure of BurgerFi's corporate damages.

289. Sternberg's benefits included, but are not limited to, lease-related benefits through Lionheart-affiliated real estate, and any other benefits from insider-controlled transactions.

290. Greenfield's benefits included, but are not limited to, BurgerFi director compensation, if any.

291. The perfunctory nature of the Audit Committee's approval underscored the absence of meaningful oversight. On October 30, 2021, a Saturday evening, four days before closing, Holland & Knight circulated the draft consent to Audit Committee members by email. Committee members responded "Approved" within minutes. No questions were asked. No independent analysis was conducted. The entire governance process for approving a $250,000 related-party payment to a deal advocate was reduced to one-word email responses on a weekend evening.

292. Rabinovitch's benefits subject to potential disgorgement include, without limitation: The total value of these benefits is believed to exceed $1.5 million based on publicly

available disclosures, subject to confirmation through discovery, but include a base salary of $240,000 (2021), increased to $400,000 (March 2022 through July 2023).

293. The exact amount of the benefits received or retained by each Fiduciary Defendant cannot be determined without further discovery, accounting, and examination of BurgerFi's books and records.

## COUNT VII: CONSTRUCTIVE FRAUDULENT TRANSFER UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT

**(Against BTIG, Rabinovitch, and The Ivy Companies)**
**(Brought pursuant to 11 U.S.C. §§ 544(b) and 550 and Fla. Stat. §§ 726.105(1)(b) and 726.106(1))**

294. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

295. This Count is brought pursuant to sections 544(b) and 550 of the Bankruptcy Code and Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101-726.112.

296. The transfers challenged herein were made within the four-year period prescribed by Fla. Stat. § 726.110, as BurgerFi's bankruptcy petition was filed on September 11, 2024.

297. On November 3, 2021, BurgerFi consummated the Anthony's Acquisition. As set forth in detail above, the Anthony's Acquisition rendered BurgerFi insolvent by burdening the Company with approximately $160 million in acquisition-related obligations. Each of the transfers challenged in this Count was made in connection with the insolvency producing Anthony's Acquisition.

298. While the available documents establish that certain of these payments were approved before the closing on November 3, 2021, the precise timing of when each transfer was actually made remains to be determined through discovery.

299. The following factors demonstrate that, to the extent any challenged transfer occurred before closing, the transfer and the closing of the Anthony's Acquisition should be treated as a single integrated transaction for purposes of the insolvency and financial-condition elements: (a) each transferee's fees or bonuses were incurred for the specific purpose of the Anthony's Acquisition; (b) payment was required because the closing of the Anthony's Acquisition was imminent; (c) each transferee's entitlement to the challenged payment was contingent upon, or directly connected to, the consummation of the Anthony's Acquisition; (d) the payments were approved only days before the closing; (e) the closing documents and compensation approvals treated the payments as transaction-related expenses; (f) the Anthony's Acquisition was effectively committed and substantially certain to close at the time the payments were approved; and (g) the Anthony's Acquisition, viewed as a whole, rendered BurgerFi insolvent and left the Company unable to pay its debts as they became due.

300. In the alternative, even if the single integrated transaction doctrine does not apply to unify any pre-closing transfers with the closing for purposes of Fla. Stat. § 726.106(1), each transfer is independently avoidable under Fla. Stat. § 726.105(1)(b) made applicable through 11 U.S.C. § 544(b) and recoverable pursuant to 11 U.S.C. § 550. At the time the challenged payments were approved, BurgerFi was about to engage in the Anthony's Acquisition, a transaction for which its remaining assets were unreasonably small, and BurgerFi intended, believed, or reasonably should have believed that the closing of the Anthony's Acquisition would leave it unable to pay its debts as they became due. Section 726.105(1)(b) does not require proof that the debtor was technically insolvent on the precise date of each payment. It requires only that the debtor did not receive reasonably equivalent value and either was about to engage in a transaction for which its remaining assets would be unreasonably small or reasonably should have believed it

would incur debts beyond its ability to pay. Both conditions are satisfied here regardless of the precise timing of each transfer.

**A. BTIG – Constructively Fraudulent Transfer of Success Fee**

301. *[Omitted pursuant to disputed confidentiality designation.]* The precise timing of when this payment was made remains to be confirmed through discovery, but payment of *[Omitted pursuant to disputed confidentiality designation.]* constituted a transfer of an interest of BurgerFi in property within the meaning of Fla. Stat. § 726.102(14) and 11 U.S.C. § 544(b).

302. *[Omitted pursuant to disputed confidentiality designation.]* Reasonably equivalent value is measured from the debtor's perspective at the time of the transfer. As alleged in detail above, BTIG did not provide BurgerFi with the independent financial advisory services for which it was retained. Instead, BTIG: (a) rubberstamped conflicted insiders' materially inflated and unreliable projections and provided them with the veneer of credibility by repackaging them into a professional looking presentation on BTIG letterhead; (b) knowingly participated in the withholding of material financial aspects of the Acquisition from the Board; (c) accepted direction from conflicted insiders, specifically Diaz Cala, whom BTIG's own managing director, Daniel Shea, acknowledged was not an officer of BurgerFi but rather "worked more for Lionheart than directly operating at BurgerFi", including implementing Diaz Cala's dictated 22x multiple without advising the board of more viable alternatives; and (d) removed financial information from the Board deck at management's direction without alerting the Board to the significance of those removals, including a footnote concerning Anthony's net debt balance and a reference to 2021 EBITDA.

303. *[Omitted pursuant to disputed confidentiality designation.]* BTIG was engaged specifically to advise the Board in connection with the Acquisition, and its engagement had no independent purpose apart from the transaction. These facts establish that, if the payment preceded

closing, the payment and closing were interdependent steps in a single integrated transaction. When the transaction is viewed as a whole, BurgerFi was rendered insolvent.

304. In the alternative, regardless of whether *[Omitted pursuant to disputed confidentiality designation.]* was paid before or after closing, BurgerFi was about to engage in a transaction (the Anthony's Acquisition) for which its remaining assets were unreasonably small, and BurgerFi intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Section 726.105(1)(b) independently renders this transfer avoidable without regard to BurgerFi's precise solvency at the moment of payment.

305. With respect to the transfer to BTIG, the Liquidating Trustee seeks: (a) avoidance of the *[Omitted pursuant to disputed confidentiality designation.]* transfer pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1); and (b) recovery of the transferred property or its value from BTIG pursuant to 11 U.S.C. § 550(a).

**B. Rabinovitch – Constructively Fraudulent Transfer of Deal-Contingent Bonus**

306. Rabinovitch received a $250,000 cash bonus from BurgerFi in connection with the Anthony's Acquisition. The bonus was approved by the Compensation Committee on November 1, 2021, two days before the closing of the Anthony's Acquisition on November 3, 2021. As alleged above, Diaz Cala directed on September 23, 2021, that there would be "payments of up to $500,000 in cash compensation to the M&A / Finance team right after closing (so as to not trip the Regions cash consents)," indicating that the timing of these payments was deliberately structured around the closing. While the bonus was approved before closing, the precise timing of when the transfer was actually made remains to be confirmed through discovery. The payment of the $250,000 bonus to Rabinovitch constituted a transfer of an interest of BurgerFi in property within the meaning of Fla. Stat. § 726.102(14), made applicable through 11 U.S.C. § 544(b).

307. BurgerFi did not receive reasonably equivalent value in exchange for the $250,000 bonus paid to Rabinovitch. The bonus was not compensating Rabinovitch for services rendered that benefited BurgerFi. Rather, it was deal-contingent compensation paid for closing a transaction that destroyed the Company. As alleged in detail above, Rabinovitch, in his capacity as Chief Financial Officer, *inter alia*: (a) prepared, approved, or permitted the use of financial projections that assumed a 286% increase in Anthony's EBITDA over trailing performance without adequate factual basis; (b) at Sternberg's direction, raised revenue assumptions for the express purpose of "bridg[ing] the gap" back to predetermined EBITDA targets, even though Rabinovitch himself later admitted the $2 million per new store assumption "isn't a good assumption"; (c) maintained materially different projection sets for different audiences, directing the fairness opinion provider Cassel Salpeter to use the aggressive equity case rather than the more conservative lender case; and (d) abdicated his statutory and bylaw-mandated duties as CFO by allowing Diaz Cala, an independent contractor with no formal corporate authority, to dominate the flow of, and manipulate and suppress, material financial information shared the board and advisors. The $250,000 bonus rewarded Rabinovitch for closing a transaction built on projections he knew or should have known were unreliable. BurgerFi received no value, let alone reasonably equivalent value, in exchange for this payment.

308. To the extent the $250,000 bonus payment to Rabinovitch is found to have occurred before the closing of the Anthony's Acquisition, the payment and closing should be treated as a single integrated transaction for purposes of the insolvency and financial-condition elements. Rabinovitch's bonus was approved by the Compensation Committee on November 1, 2021, just two days before the closing, and was conditioned on consummation of the Anthony's Acquisition. The Stock Purchase Agreement itself authorized the Company to award up to $500,000 in

discretionary performance bonuses to management, and the insiders allocated the entirety of this pool to themselves. The timing of the bonus approval (two days before closing, with payment structured to occur "right after closing (so as to not trip the Regions cash consents)") confirms that this payment was an integral component of the closing transaction, not an independent compensation decision. At the time the bonus was approved, the material terms of the Anthony's Acquisition had been fixed, the closing was substantially certain, and Rabinovitch knew that his compensation was directly tied to consummation of the Acquisition. When the transaction is viewed as a whole, BurgerFi was rendered insolvent.

309. In the alternative, regardless of whether the $250,000 bonus was paid before or after closing, BurgerFi was about to engage in a transaction (the Anthony's Acquisition) for which its remaining assets were unreasonably small, and BurgerFi intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Rabinovitch himself acknowledged BurgerFi's dire financial trajectory: on September 20, 2021, he wrote that "[i]t's looking pretty grim, EBITDA at $3.5m and cash balances getting lower than they need to be." Section 726.105(1)(b) independently renders this transfer avoidable without regard to BurgerFi's precise solvency at the moment of payment.

310. With respect to the transfer to Rabinovitch, the Liquidating Trustee seeks: (a) avoidance of the $250,000 transfer pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1); and (b) recovery of the transferred property or its value from Rabinovitch pursuant to 11 U.S.C. § 550(a).

### C. The Ivy Companies – Constructively Fraudulent Transfer of Deal-Contingent Bonuses

311. The Ivy Companies, Inc. received a $250,000 cash bonus from BurgerFi in connection with the Anthony's Acquisition, paid in November 2021 as disclosed in the Company's

2022 proxy statement. The Ivy Companies is a consulting entity owned and controlled by Diaz Cala, and served as the vehicle through which Diaz Cala received compensation from BurgerFi. The bonus was authorized under the Stock Purchase Agreement's $500,000 discretionary bonus pool, of which the insiders allocated the entirety to themselves. While payment occurred in November 2021, the precise timing of when the transfer was made relative to the closing on November 3, 2021 remains to be confirmed through discovery. The payment of the $250,000 bonus to The Ivy Companies constituted a transfer of an interest of BurgerFi in property within the meaning of Fla. Stat. § 726.102(14), made applicable through 11 U.S.C. § 544(b).

312. BurgerFi did not receive reasonably equivalent value in exchange for the $250,000 bonus paid to The Ivy Companies. The bonus was not compensation for independent consulting services that benefited BurgerFi. Rather, it was deal-contingent compensation paid for closing a transaction that destroyed the Company. As alleged in detail above, Diaz Cala (through The Ivy Companies) served not as a disinterested consultant but as Sternberg's de facto operative in driving the Anthony's Acquisition. Among other wrongful acts: (a) Diaz Cala handpicked and engaged both BTIG and Cassel Salpeter without formal Board authorization, selecting advisors with pre-existing relationships who would be responsive to management's direction; (b) Diaz Cala determined the EBITDA figure that would anchor the fairness opinion, directing the seller to build a model supporting a $17.5 million EBITDA number and arranging for it to be transmitted to Cassel Salpeter; (c) Diaz Cala dictated critical valuation assumptions to BTIG, including instructing BTIG to "[p]ls use 22x as the multiple. With $1.5mm in synergies"; (d) Diaz Cala orchestrated the restructuring of the Acquisition to avoid a shareholder vote after Lion Point's opposition; and (e) Diaz Cala controlled communications between management, advisors, and the Board, serving as the sole or primary conduit for information flow and the manipulation and

suppression of material information. The services Diaz Cala provided through The Ivy Companies did not benefit BurgerFi; they advanced the personal interests of Sternberg and the Insider Defendants at the Company's expense. BurgerFi received no value, let alone reasonably equivalent value, in exchange for this payment.

313. To the extent the $250,000 bonus payment to The Ivy Companies is found to have occurred before the closing of the Anthony's Acquisition, the payment and closing should be treated as a single integrated transaction for purposes of the insolvency and financial-condition elements. The bonus was deal-contingent compensation authorized under the Stock Purchase Agreement, approved by the Audit Committee on October 30, 2021 (four days before closing) and paid in connection with the closing in November 2021. Diaz Cala himself, in his September 23, 2021 email, described the bonus as part of "payments of up to $500,000 in cash compensation to the M&A / Finance team right after closing (so as to not trip the Regions cash consents)," confirming that these payments were timed to the closing and were integral components of the transaction. The Ivy Companies' entitlement to this bonus was entirely dependent on consummation of the Anthony's Acquisition. At the time the bonus was approved, the material terms of the Acquisition had been fixed, the closing was substantially certain, and Diaz Cala (through The Ivy Companies) knew that the compensation related directly to consummation of the transaction. When the transaction is viewed as a whole, BurgerFi was rendered insolvent.

314. In the alternative, regardless of whether the $250,000 bonus was paid before or after closing, BurgerFi was about to engage in a transaction (the Anthony's Acquisition) for which its remaining assets were unreasonably small, and BurgerFi intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Diaz Cala was intimately familiar with BurgerFi's financial condition and the consequences of the

impending closing, having served as the Company's de facto COO and having driven the entire Acquisition process. Section 726.105(1)(b) independently renders this transfer avoidable without regard to BurgerFi's precise solvency at the moment of payment.

315. With respect to the transfer to The Ivy Companies, the Liquidating Trustee seeks: (a) avoidance of the $250,000 transfer pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1); and (b) recovery of the transferred property or its value from The Ivy Companies pursuant to 11 U.S.C. § 550(a).

**COUNT VIII: CONSTRUCTIVE FRAUDULENT TRANSFER UNDER FLORIDA'S UNIFORM FRAUDULENT TRANSFER ACT AGAINST 200 W. CYPRESS CREEK HOLDINGS**

**(Brought pursuant to 11 U.S.C. §§ 544(b) and 550 and Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108)**

316. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

317. This Count is brought pursuant to sections 544(b) and 550 of the Bankruptcy Code and Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101-726.112, including Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108.

318. The transfers challenged herein were made within the four-year period prescribed by Fla. Stat. § 726.110, as BurgerFi's bankruptcy petition was filed on September 11, 2024. The transfers include, without limitation, rent payments made by BurgerFi under the BurgerFi-Cypress Creek Lease to or for the benefit of Cypress Creek Holdings, including a portion of approximately $500,000 in rent paid in 2022 and approximately $700,000 in rent paid in 2023, together with such additional rent payments, escalations, required expansion payments, charges, and related lease payments as discovery may establish.

319. In January 2022, after BurgerFi terminated its prior three-year lease for corporate office space in North Palm Beach, Florida, Sternberg's company, purchased the commercial building located at 200 W. Cypress Creek Road, Fort Lauderdale, Florida for $14.5 million.

320. Upon information and belief, Cypress Creek Holdings collected rent payments from BurgerFi and functioned as the related-party lease counterparty and rent-collection vehicle through which value was transferred out of BurgerFi.

321. Accordingly, Cypress Creek Holdings was the initial transferee of BurgerFi's rent payments, or the entity for whose benefit such transfers were made, within the meaning of 11 U.S.C. § 550(a)(1).

322. BurgerFi did not receive reasonably equivalent value in exchange for the entirety of the rent payments made under the BurgerFi-Cypress Creek Lease. Upon information and belief, the amount BurgerFi was caused to pay under the lease was above fair market value for the leased space; the amount of space BurgerFi was caused to lease was excessive and not needed for BurgerFi's business operations; and the ten-year lease term, significant rent escalations, and required expansions were onerous and not reasonably equivalent to BurgerFi's actual operational needs.

323. At the time BurgerFi made the challenged rent payments, BurgerFi was insolvent, was left with unreasonably small assets and capital in relation to its business and anticipated obligations, and/or intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

324. The challenged transfers are avoidable under Fla. Stat. § 726.105(1)(b) because BurgerFi made the transfers without receiving reasonably equivalent value and BurgerFi was engaged, or was about to engage, in a business or transaction for which its remaining assets were

unreasonably small in relation to the business or transaction, and/or intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. The challenged transfers are also avoidable under Fla. Stat. § 726.106(1) because BurgerFi made the transfers without receiving reasonably equivalent value and was insolvent at the time of the transfers or became insolvent as a result of the transfers.

325. With respect to the transfers to or for the benefit of Cypress Creek Holdings, the Liquidating Trustee seeks: (a) avoidance of the transfers pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1); and (b) recovery of the transferred property or its value from Cypress Creek Holdings as the initial transferee, or the entity for whose benefit such transfers were made, pursuant to 11 U.S.C. § 550(a)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dan Dooley, as Liquidating Trustee, respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

(a) An award of compensatory damages against Defendant Rabinovitch in an amount to be determined at trial, including but not limited to damages arising from the decline in BurgerFi's tangible net worth, the increased debt burden, wasted transaction and advisory fees, impaired operations, and insolvency proximately caused by Rabinovitch's breaches of his duties of care and loyalty;

(b) An award of compensatory damages against Defendants Sternberg and Greenfield, jointly and severally, in an amount to be determined at trial for all damages proximately caused by their breaches of the duty of loyalty, including but not limited to damages arising from the decline in BurgerFi's tangible net worth, the increased debt burden, wasted transaction

and advisory fees, the self-dealing BurgerFi-Cypress Creek Lease, impaired operations, and insolvency;

(c) An award of compensatory damages against Defendants Diaz Cala, The Ivy Companies, Inc., Cassel Salpeter & Co., LLC, and BTIG, LLC, jointly and severally with each other and with the Fiduciary Defendants, in an amount to be determined at trial for all damages proximately caused by their knowing participation in the Fiduciary Defendants' breaches of fiduciary duty;

(d) An award of compensatory damages against Defendant Cassel Salpeter & Co., LLC, in an amount to be determined at trial for all damages proximately caused by its professional negligence and negligent misrepresentations, including but not limited to damages arising from the Board's reliance on Cassel Salpeter's materially deficient fairness opinion in approving the Anthony's Acquisition;

(e) An award of compensatory damages against Defendant BTIG, LLC, in an amount to be determined at trial for all damages proximately caused by its professional negligence, including but not limited to damages arising from the Board's reliance on BTIG's materially incomplete and misleading financial advisory presentation in approving the Anthony's Acquisition;

(f) In the alternative to compensatory damages, an order requiring Defendants Sternberg, Greenfield, and Rabinovitch to account for and disgorge all compensation, fees, bonuses, severance payments, separation benefits, lease-related benefits, stock grants, and any other economic benefits received or retained by them from or through BurgerFi or insider-controlled transactions during the period of their disloyalty;

(g) An order avoiding the following transfers pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1):

(i) The *[Omitted pursuant to disputed confidentiality designation.]* paid to BTIG, LLC;

(ii) The $250,000 deal-contingent cash bonus paid to Rabinovitch; and

(iii) The $250,000 deal-contingent cash bonus paid to The Ivy Companies, Inc.;

(h) An order directing recovery of the transferred property or its value from BTIG, LLC, Rabinovitch, and The Ivy Companies, Inc. pursuant to 11 U.S.C. § 550(a);

(i) An order avoiding all rent payments, escalations, required expansion payments, charges, and related lease payments made by BurgerFi under the BurgerFi-Cypress Creek Lease to or for the benefit of 200 W. Cypress Creek Holdings, LLC , pursuant to 11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1);

(j) An order directing recovery of the transferred property or its value from 200 W. Cypress Creek Holdings, LLC as the initial transferee, or the entity for whose benefit such transfers were made, pursuant to 11 U.S.C. § 550(a)(1);

(k) Pre-judgment and post-judgment interest at the highest rates permitted by law;

(l) Plaintiff's reasonable attorneys' fees and costs of suit to the extent permitted by law;

(m) Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

/s/ Curtis B. Miner

Curtis B. Miner (Florida Bar No. 885681)
Thomas Kroeger (Florida Bar No. 19303)
COLSON HICKS EIDSON, P.A.
806 S. Douglas Road, Suite 1200
Coral Gables, Florida 33134
Telephone: (305) 476-7436
curt@colson.com
tom@colson.com

Alicia M. Bendana, *pro hac vice* pending
Kaja S. Elmer, *pro hac vice* pending
Gabriel J. Winsberg, *pro hac vice* pending
Margaret M. Daly, *pro hac vice* pending
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
abendana@fishmanhaygood.com
kelmer@fishmanhaygood.com
gwinsberg@fishmanhaygood.com
mdaly@fishmanhaygood.com
*Attorneys for Plaintiff Dan Dooley, Liquidating Trustee of the BurgerFi International, Inc. Liquidating Trust*